ALLEN *v.* PULFER.

FRAUD — OPINIONS — RESCISSION IN EQUITY — STOCK AND STOCK-HOLDERS.

The defendants obtained an agreement from the complainants to exchange stock in a foreign corporation at par for the business of complainants, and after securing the contract doubled the capital stock of the defendant company, without making any additional payment or assessment, and without increasing the assets of the corporation. False representations were made as an inducement for the making of the exchange, to the effect that the defendants could make more money for the complainants, that the stock would pay six per cent. dividends, that the corporation could make large advances for the business, and that the business would improve; defendants also promised that the corporation would

remove to Detroit and appoint complainants managers of departments. The promises were not performed. *Held,* that fraud was shown which would justify rescission in equity.

Appeal from Wayne; Mandell, J. Submitted December 15, 1909. (Docket No. 135.) Decided February 3, 1910.

Bill by Eugene D. Allen and others against George B. Pulfer and Mentor Wetzstein, individually and as trustees, the Ideal Concrete Machinery Company, and the Architectural Mold Company to set aside certain articles of incorporation on the ground of fraud. From a decree for complainants, defendants, except the Architectural Mold Company, appeal. Affirmed.

*Orla B. Taylor* and *Charles F. Delbridge,* for complainants.

*Graves, Hatch & Wasey,* for appellants.

OSTRANDER, J. The record presents questions of fact only. It would profit no one to set out the testimony. What was actually accomplished through the dealings of the parties was this: Complainants, who were copartners in a small but growing business, were induced by defendants, or by some of them, to incorporate under Michigan laws and to assign the stock of the corporation to trustees for the defendant Ideal Concrete Machinery Company, an Indiana corporation. The inventoried value of the property of the corporation so organized was $4,133.37. The stock was exchanged for $4,000 par value of the stock of the above-named corporation, which was capitalized at $200,000 and the capital of which had been increased a few days before the exchange referred to, and after negotiations were begun, from $100,000, without the contribution of any money from any source and without the addition of anything of value to its assets, unless it was a reissue patent and other patents. The contract of the parties

is in writing and dated February 12, 1907. The monthly statement of the Ideal Concrete Machinery Company for December, 1906, the last one before the capital stock was doubled, showed assets of $114,043.59, of which $22,197.28 was notes receivable and $21,773.12 patents. Total liabilities, including capital stock, were $131,351.78. The notes treated as assets included notes of defendant Pulfer for $11,500, with stock of the company as security, and note of one Smith for $10,000, given for treasury stock, which stock was held as security. Liabilities included accounts, payable $8,262.78, notes payable $20,000, personal accounts $3,089. The statement of the company for January, 1907, showed assets of $208,265.15, and liabilities including $200,000 capital stock, of $230,848.50. The assets were increased by valuing patents at $121,773.12, which it will be seen was an increase over the valuation of the prior month of $100,000. Various representations were made to complainants by the defendant Pulfer to bring about the transfer of complainants' property, first, to a corporation, and then to the defendant Ideal Concrete Machinery Company, which must be regarded as statements of fact and not of opinion, although, if the dealings had been between persons of equal or nearly equal intelligence in such matters, they might be regarded as expressions of opinion merely. The reason for this is well expressed in the opinion of the trial judge, who found and said:

"Prior to entering into this deal, none of the complainants had had the advantage of a business education. They were unlearned and unskilled in business, and particularly in corporate ways. No explanation can be given for the deal that they actually entered into, unless upon the theory that they expected and were led to believe they would get some advantage out of it, not contained in the papers they signed, for by the deal they gave up their business, all proprietorship therein, and reduced themselves to the condition of mere employés, who could be discharged at will, with or without reason, and they were bound by the terms of their contract not to engage in any similar business for themselves for the period of three

years from the date of the contract. What did they get in return? The privilege of working for about mechanics' wages in Detroit for an Indiana corporation, and each received $1,000 worth par value of the stock in such corporation. If they understood the contract, and if there was nothing more to, the contract than appears in the written paper, then most assuredly there can be no doubt that the bargain was a very one-sided one, for the physical property they gave up was clearly worth $4,000, to say nothing of the patent which it was claimed was worth, and appears to be worth, $1,000 additional, for $4,000 par value of stock which was then of doubtful value. When the papers were examined by an attorney of standing in this community, he stated to them that the papers were properly drawn, but that their interests were not taken care of therein. One of the complainants stated in the presence of at least one of the defendants that the complainants depended upon the good faith of the defendants, and that their protection was in the confidence they had in the defendants. This confidence was born undoubtedly out of certain statements and assurances of the defendants. The evidence clearly shows that the negotiations lasted some little time, and that several interviews were had between one or more of defendants and the complainants, and that in these interviews the complainants were assured by the defendants that they, the complainants, were not making enough money, and that the defendants could make more money for them; that it was to the complainants' advantage to make the deal; that the defendants could advance lots of money to get out forms, etc. They were assured that 'your business will improve.' They were also informed that the business of the Ideal Concrete Machinery Company would be moved to Detroit, and gradually enlarged, and that the stock of that company would net a return of 6 per cent., and that each of complainants would be appointed head of a department. It is claimed by the defendants that these very statements made by them were made in good faith, and that no charge of fraud can be predicated on them, because they were merely executory promises, but in view of the peculiar nature of the contract, and the character of what the complainants were giving, and what they were actually receiving, under the terms of the contract, I am convinced that these various statements should be construed into statements of conditions actually existing, that

justified the conclusions drawn by the defendants and assurances given to the complainants."

The promises made to complainants have not been kept. That complainants were in fact deceived cannot be doubted. I am satisfied from the testimony that deceit—actual inducing of beliefs, based upon speculative statements accepted by complainants as true, affecting and intended to affect the action of complainants to their detriment and to the advantage of defendants—was practiced, and was intended to be practiced.

The decree requires the holders of the stock of the Architectural Mold Company to return it to complainants, and requires the complainants to return the shares they received in the Ideal Concrete Machinery Company. We are all agreed that the decree should be affirmed.

MONTGOMERY, C. J., and HOOKER, MOORE, and MC-ALVAY, JJ., concurred.