### KEFUSS *v.* WHITLEY.

1. FRAUD—MISREPRESENTATIONS—PROMISES—EXPRESSION OF OPINION—STATEMENTS OF FACTS—VENDOR AND PURCHASER.

In a suit for the rescission of a contract for the purchase of land on the ground of fraud, statements by defendants, vendors, who were dealers in real estate and acquainted with the value of same, that the land purchased

On effect of purchaser's concealment or misrepresentation of fact affecting the value of real estate, see note in 30 L. R. A. (N. S.) 748.

On future promise as fraud, see note in 10 L. R. A. (N. S.) 640.

was worth at least $250,000 for subdivision purposes; that one of the defendants was an adept at handling such properties and that he could and would sell all the lots within 90 days; that approximately $25,000 ready money was all that plaintiff would have to expend in its purchase, and that this would be returned to him within 90 days; that defendants' reason for making the sale was because they were overloaded with such property and needed ready money to handle it; and that they would sell only on condition that one of the defendants be given the sales agency for the subdivision, *held*, to be not mere promises or expressions of opinion, but statements of material facts which plaintiff had a right to presume were within the knowledge of defendants, and of which defendants knew plaintiff was without knowledge.

2. SAME—PROMISES TO BE RELIED UPON TO BE TREATED AS ASSERTIONS OF FACTS.

Representations, even if untrue, intended to be understood as mere promises or expressions of opinion, do not constitute fraud, especially when honestly made or entertained; but when uttered under circumstances importing that they are expected to be relied upon and acted upon, promises will become undertakings and opinions treated as assertions of fact.

3. SAME—REPRESENTATIONS KNOWN TO BE UNTRUE—VENDOR AND PURCHASER.

The representations of defendants as to the value of said land, *held*, under the evidence, to have been known to them to be untrue, and to have been made for the purpose of inducing plaintiff to relieve them of an investment quite certain to result in loss, apparent to them as men of experience in the subdivision business.

4. SAME—REPRESENTATIONS RELIED UPON.

That plaintiff investigated the proposition with a friend, gave the matter due consideration, and that the hope of large gains appealed to his cupidity, *held*, not to deprive him of the right to insist that he was induced to enter into the contract by the fraudulent representations of defendants.

5. SAME—WAIVER—RIGHT TO RESCIND.

By the giving of notes in payment of sums remaining due on said purchase price after the time defendants had promised to have the whole subdivision sold, plaintiff did

not waive his right to rescind the contract for the fraud practiced upon him, where he was continually lulled into security by promises and excuses, although as to some of these transactions he had the benefit of his attorney's advice.

6. Same—Collusion—Act of One the Act of All.

Where there is evidence that parties are acting in collusion, everything said, done, or written by any one of the parties to the combination, in furtherance of the common purpose, is deemed the act of all.

7. Same—Defendant Who Profits by Fraud May Not Complain if Parties Are Placed in Statu Quo.

Where it is a fair inference from the proofs that one of the defendants knew all about the deal in which plaintiff was defrauded, and profited thereby, he may not complain of a decree which, so far as possible, places the parties *in statu quo*, although no false representations were made by him personally, nor were they made in his presence or by his authority.

Wiest, Clark, and Moore, JJ., dissenting.

Appeal from Lenawee; Hart (Burton L.), J. Submitted February 2, 1922; resubmitted June 14, 1922. (Docket No. 138.) Decided July 20, 1922. Rehearing denied November 2, 1922.

Bill by Charles F. Kefuss against J. B. Whitley and Frank P. Davey for the rescission of a land contract on the ground of fraud. From a decree for plaintiff, defendants appeal. Affirmed.

*B. D. Chandler* and *J. N. Sampson,* for plaintiff.

*Campbell, Dewey, Stanton & Bushnell,* for defendant Whitley.

*Earl I. Heenan,* for defendant Davey.

Wiest, J. (*dissenting*). Claiming that defendants, by false and fraudulent representations, led him to pay them $28,000 on account of a certain real estate

transaction, plaintiff filed the bill herein to have his contract relations with them rescinded, and a decree granted for the money so paid. In the circuit he was granted relief and the case is here on appeal taken by defendants.

We do not agree with the determination reached by the learned circuit judge, and will, as briefly as possible, point out our reasons for dismissing the bill. At the time the relations between the parties commenced it was evidently believed that Marysville, in St. Clair county, on account of the Wills-Lee automobile factory being located there, bid fair to become a large city, and real estate, including nearby farm lands, was subdivided into numerous lots. Defendants held an option on an 80-acre farm upon which they had paid $8,000, and were to pay $48,000 more, and, being in the real estate business in Detroit, first planned to plat the land and sell lots. Without doing this, however, they gave another real estate dealer named McDonald the right to sell the 80 acres at a price of $72,000.

Plaintiff resides at Hudson in this State, is a man 59 years of age, engaged in the custom milling business, had been a member of the board of directors of one of the banks there, and mayor of the city. He had invested in real estate in the city of Detroit, making the purchase of one piece at $34,000, and it is now worth about $50,000, and he bought and sold another piece of real estate in Detroit.

Nathan R. Cook, a cousin of plaintiff, was in the real estate business in Detroit and had aided plaintiff in his investments in real estate in that city. On or about April 18, 1920, plaintiff visited Mr. Cook in Detroit, to advise with him about the sale of some of his Detroit property, and there met Mr. McDonald who informed him about the Marysville property and the prospect of profits to be made therefrom and in-

vited him to the office of defendant Whitley to investigate.

The plaintiff's version of what occurred in Mr. Whitley's office in substance follows:

"Mr. Whitley said that they had this piece of land up there at Marysville and that they had several pieces of land up there and that they were short of money; that he was short of money, and if one could furnish $25,000, why, he would go on and sell that, and I think they made out about 500 lots or 550. I told Mr. Whitley right then just the same as I told Mr. McDonald upstairs, that I could scrape up $25,000, and that I wouldn't go into it without they would agree to sell these lots because I was not a real estate man and didn't know the first thing about it, and it would be foolish for me to put my money into a thing I knew I couldn't sell, and he said there would be no trouble and he would guarantee the sale of it and I would have nothing to do with it whatever. They would sell it from 30 to 90 days. They would sell it within the 90 days. I wouldn't be required to put anything more than $25,000 in there. * * * I told Mr. Whitley to write that down on a piece of paper so I would know just in regard what to expect he would do and he took a piece of paper and a pencil and wrote down there."

About April 22d the plaintiff, accompanied by Mr. Rumsey, who had been cashier of a bank in Hudson, and in whose business judgment he had confidence, visited Detroit with reference to this matter, and Mr. Rumsey asked Mr. Whitley some questions and asked him if he would be willing to give a bond. Mr. Whitley invited plaintiff and Mr. Rumsey to go to Marysville to look around and see what was there, and they visited Marysville, examined the property in suit, talked with an owner of property in the vicinity and returned to Detroit and to the office of Mr. Whitley. Mr. Rumsey asked him again about a bond and plaintiff claims that Mr. Whitley said:

"That he didn't believe that he needed to give a

bond or wouldn't give a bond because his word was good; and he agreed to sell these lots and he would sell them."

Plaintiff further testified, he (Whitley) said in all three of these talks that he would sell these lots and that he had sold off quite a number of subdivisions and that there would be no question whatever.

Plaintiff claims:

"If I hadn't believed and relied upon the representations that Mr. Whitley made, I wouldn't have entered into the contract that I afterwards did with him and would not have paid him this amount of money. After this talk, I didn't conclude to enter into the deal right at that minute. I told him that I was going home that night and I would take it under advisement."

He left with Mr. Cook a check for $1,000, payable to Mr. Whitley, and said he would let him know in the morning whether he should pay it or not.

On April 26th plaintiff again visited Detroit. In the meantime Mr. Cook had delivered the check to Mr. Whitley. At that time he paid $9,000 to Mr. Whitley, and was to pay $15,000 on May 10th. Plaintiff claims that defendant Whitley again guaranteed to sell the lots and that he would have half of the lots sold before the second payment was due on May 10th. Defendant Davey was present at that time and plaintiff claims he informed Mr. Davey, in substance, of the understanding with Mr. Whitley. At that time a contract was drawn reciting the purchase of the property on land contract, by plaintiff, in which defendant Whitley agreed to devote his best energies toward making speedy sales, and fixed the commission to be paid Mr. Whitley at 30 per cent. of the selling price, and Mr. Whitley might retain one-half of any sums due to plaintiff to apply on the payment of four notes totaling $17,000 to be given by plaintiff to defendants. On the same day a land contract was executed

by defendants to plaintiff.   The consideration being $72,000, to be paid as follows:

"Ten thousand ($10,000.00) dollars at the date hereof, and the remaining sixty-two thousand ($62,000.00) dollars as follows: $15,000.00 on or before the 10th day of May, 1920; on which date there is also to be paid $17,000.00; in four notes payable $5,000.00 July 26, 1920, and $4,000.00 October 26, 1920, $4,000.00 January 26th, 1921, and $4,000.00 April 26th, 1921; said notes to bear interest at 6% per annum; the balance of $30,000.00 to be payable $5,000.00 or more yearly, the first of said yearly payments to be due and payable 1 year from date hereof with interest from date on all sums at any time unpaid hereon at the rate of 6 per cent. per annum till due, and thereafter at the rate of 6 per cent. per annum till paid, payable semi-annually herefrom."

Plaintiff claims there was a verbal agreement in which defendants agreed:

"That this $17,000 that they had of their equity, should be paid out of the sale of these lots, and of course when they made this contract they changed that, that is, they changed that $17,000 there, but I still insisted all the time that that should come from the payments on the lots, and Mr. Whitley said to me when I told him that I didn't have any more money to pay this $17,000, he says 'Don't worry, Mr. Kefuss, the payments on these lots will take care of that?' I relied upon that and believed him.   That was made in Mr. Davey's presence."

The plaintiff paid the $15,000 on May 10th and about two weeks later he received a letter from Mr. Davey asking him to execute the four notes mentioned. Plaintiff then visited Mr. Whitley and claimed to him he was not to pay any notes, that the payment of notes was to come out of the proceeds of sales of lots, and Mr. Davey came in and insisted that he should give the notes and he gave them.   He claims that Mr. Whitley guaranteed him he would not have the notes to pay, and that Mr. Davey said:

"Mr. Whitley can sell those lots and will sell those lots and that I wouldn't have those notes to pay; that would come from the sale of the lots. After that I gave those notes and delivered them to Mr. Davey. I believed absolutely the statements of Mr. Whitley and Mr. Davey, and relying upon that was what induced me to give those notes. * * * The first thing I knew I got notice from the bank that they held my note there for $5,000 and it would be due on the 20th. It was not to be due until the 26th. Mr. Whitley and Mr. Davey were on their promise to sell these lots and I paid them $25,000 to kind of carry it along. I thought they were going to be able to sell the lots. * * * Later I paid $500 more. Still he was claiming he was going to sell these lots and would sell them."

The bill herein was filed October 28, 1920, and it was only two or three days before that plaintiff made up his mind the defendants were not going to carry out their agreement to sell the lots.

The plaintiff was no novice in business affairs. He was capable of engaging in speculative real estate ventures. The deal in question was purely speculative, just as plaintiff's friend Rumsey advised him, contingent for success upon the continuation of the local boom at Marysville, and when the bottom fell out of the boom, as it evidently did, plaintiff awakened from his dream of easy and quick money. His claim of child-like reliance upon the assurance that the farm could be cut into lots and sold within 90 days and net him $100,000 on an investment of $25,000, would show a credulity almost equal to seeking the pot of gold at the foot of the rainbow, were it not for the fact that he wanted a bond guaranteeing the fulfillment of the golden dream, and when this was refused, he decided, after mature deliberation, to take the chance. He took the chance and lost and now wants his money back and to be relieved from his written obligations.

If he is granted relief upon this record on the theory that the parties were not evenly matched and, therefore, plaintiff got the worst of the deal, then we will have a new factor in the law of contracts.

Plaintiff appears to have taken his own time to investigate the prospect; he called in his business friend, Mr. Rumsey, and they visited Marysville, looked at the land, made such local inquiries as they desired, and against the warning of Mr. Rumsey that it looked speculative and after he had requested and been refused a bond guaranteeing success, he went into the deal and right at the start gave his notes for $17,000 more than he now claims he was to pay. It seems to have taken plaintiff a long time to discover the alleged fraud, and it is a significant coincidence that his discovery appears to have come when there ceased to be any demand for the lots.

We have said but little about the connection of Mr. Cook with the matter. Plaintiff did not see fit to make him a defendant. We find no fraud on the part of defendants in the fact that Mr. Cook demanded and received from them a commission. We find it unnecessary to discuss the defense made. The defendants denied all the fraud alleged and gave their version of the whole transaction.

There appears no equitable reason for granting the relief prayed and the decree entered in the circuit should be reversed, and a decree entered here dismissing the bill, with costs to defendants.

CLARK and MOORE, JJ., concurred with WIEST, J.

SHARPE, J. The story of the transaction may be thus told: Mr. Kefuss was a resident of and had spent his lifetime in business in a small city, some considerable distance from Detroit. Through his relative, Mr. Cook, he had made some fortunate investments in Detroit real estate. While in Cook's

office on business connected therewith, McDonald appears and reveals to him how he may secure a profit of $100,000 on an investment of approximately $25,000. He prepared and delivered to him Exhibit 1, which reads as follows:

"EXHIBIT 1.
"80 acres at $900 ...........................$72,000
"Approx. $25,000 cash to handle
            "Balance annual payments.
"$10,000 now
"$15,000 May 12th, 1920.
"500 lots at $550 each................$275,000
"Selling cost 1/3 ..................... 93,000

                                        $182,000
"Property cost ..................... 72,000

"Net profit .........................$110,000
        "$120,500
        "20,760

        "$141,260
"Gross selling...$275,000
"20% down ..... 55,000   divided 60-40 with seller in
"40% to owner .. 22,000  within 60 days from date of
                        plat O. K.

"Further payments on lot contracts divided 50/50 until selling cost paid out."

He takes him to Whitley, the master mind in the transaction. At the outset Mr. Kefuss gives Whitley to understand that he could not raise the amount of the purchase; that $25,000, or a little more, was the limit of his resources available on such a deal. He is assured that this amount is all he will ever be required to put in,—in fact, that it was almost certain the advance payments on the lots to be sold would take care of a part of this amount, and that in any event at the expiration of 90 days he would have the moneys advanced by him returned. The fact was

impressed on him over and over again that Mr. Whitley knew all about the subdivision business; that he had had much experience in handling such properties and that there was no question about his ability to sell the lots within the time stated.   He was assured that the land was worth at least $250,000 for platting purposes.   Exhibit 2, which follows, was prepared and delivered to him by Whitley:

"Exhibit 2
"The Whitley Company
"Real Estate
"Miller Building
"33 State Street
"Detroit, Michigan.
"80 acres W. ½ N. E. ¼ Sec. 12 St. Clair at $900 per acre total $72,000.
"$10,000 down $15,000 May 10, 1920.
"The balance of our equity viz: $17,000 to be paid and satisfied from sale of lots.
"$30,000 payable $5,000 yearly and interest.
"Selling contract 30% to include collections payable 60% to agent 40% to owner of down payment, then 50/50 monthly payment.
"Terms—20% down $10 monthly including interest. Minimum selling price $250,000.00.
"90 days selling contract 1/3 each month."

Mr. Kefuss, while doubtless carried away by the visions of profit thus unfolded, concluded to take time to think it over.   A few days later, he returned to Detroit, accompanied by Mr. Rumsey.   With Mr. Cook they visit the property.   To a person without vision as to the future of Marysville and the opportunity presented of subdividing and disposing of nearby property, a parcel of farming land worth, perhaps, $100 per acre was revealed.   Rumsey thought it far out for subdividing.   Cook was impressed that it was a good deal.   They return to Detroit.   The assurances of Whitley's ability and the positive statements that he could and would dispose of the property as outlined

in the memoranda and as testified to were repeated. Rumsey suggested that a bond guaranteeing performance should be given plaintiff. This Whitley declined to give, though assuring plaintiff that—

"his word was good and that he could sell this and would sell it. There wasn't any question about it at all."

At all of these conferences, it was insisted that the sale to plaintiff was conditional on Whitley's being given a sales agreement for the lots at a stated commission. Plaintiff was assured that his fear that he might be called on to pay more than $25,000 was groundless. He was apparently satisfied, though still unwilling to close the deal. Before leaving Detroit, he left with Cook a check for $1,000 for delivery to Whitley the following day unless advised to the contrary. This fact he concealed from Mr. Rumsey. The next day he was informed by Cook that the check was declined and that a down payment of $10,000 must be made. When Cook presented this check, he testified Whitley informed him—

"that, as a matter of fact, he had some other man that was willing to buy the property at the time and for that reason he would have to have quick action on it."

Cook was impressed that "Whitley could sell the property" and "so told Mr. Kefuss." Plaintiff again goes to Detroit and meets Whitley and the defendant Davey. Whitley says to him, "I can and will guarantee to sell those lots." He was again assured that he would not be required to put in more than $25,000. When the $17,000 payment provided for in the contract, being the balance of the vendor's equity in the property, was spoken of and plaintiff objected to the provision for its payment, Mr. Whitley said to him in the presence of Mr. Davey, "Don't worry, Mr. Kefuss, the payments on these lots will take care of

that." Plaintiff testified that he "relied upon that and believed him." The execution of the contract followed.

The facts stated are, I think, clearly established by the proofs. Plaintiff's testimony in part is quoted by Mr. Justice WIEST. Mr. Cook testified:

"Mr. Whitley said that special piece of property, he considered it specially good piece, about the best piece that he had at the time; that he didn't have the money to go ahead and plat it and sell it off, but he was perfectly willing to take somebody in, if somebody would go ahead and put in the $25,000 or thereabouts. He said it might be $27,000, between $25,000 and $27,000 at the utmost, and that that was all that they would ever have to put in. But he required, or he wanted the selling contract of the lots; that he had a partner with him on the property; that of course he was talking for himself. At the same time he thought there wouldn't be any objection on his partner's part in going ahead with the deal. He went on to show several different plats of other subdivisions which he had sold which he said he had sold out in 30 or 60 or 90 days, and how much he had made on the different ones, and so forth, and that he could go ahead and sell this one, and, as he told Mr. Kefuss, after paying his first $10,000 he probably wouldn't even have to pay the next $15,000 in on the 10th of May, but that at any rate he could sell out all the lots within 90 days. In fact he said at that time he needn't worry at all. Mr. Kefuss told him at that time that he could get $25,000, and if that is all it required, why, he could make some kind of a deal with him, but if it required more than that, as to paying $72,000, he wasn't able to do it; that he couldn't raise that much money, and Mr. Whitley said he needn't worry about that at all because the balance of the $25,000, or possibly $27,000 at the utmost, would come from the sale of the lots; that he would have them all sold before there was any more payments that might enter into it.

"*Q.* Was anything said about a memorandum at that time?

"*A.* Yes, Mr. Kefuss wanted him to put down at

that time, that is, Mr. Whitley, what kind of a deal he wanted to make. There had been talk of,—he said the lots would sell for around $250 to $275. He would expect 30 per cent. as selling commission of the lots, and of course there might be some little added expense here and there but that the balance of course would go to Mr. Kefuss. They talked about how much he should sell the lots for and about what average per lot. In fact he said he would make a contract.to the effect that the subdivision would not be sold at less than $250,000. It might be over that, but at least at that amount.

"*Q*. That was to be the minimum?

"*A*. Yes, that was to be the minimum."

Mr. Rumsey, who accompanied plaintiff to Detroit, testified as follows:

"We talked over in Whitley's office the matter of the purchasing of this property and the matter of his guaranteeing to Mr. Kefuss that he wouldn't have to put in over $25,000 in this deal and that he would take out something over $100,000, and I suggested to him, or I think I asked Mr. Whitley whether he proposed to put up a surety bond for this matter or whether he was going to have somebody sign some bonds with him so as to guarantee that. That was the first night that we were in there. We talked that matter over some and he didn't say for sure just which way he would do. He said it probably could be arranged some way or other and that was the way the matter was left. I learned there in the office what their talk was; that Mr. Kefuss was going to make this payment on this deal and Mr. Whitley was going to subdivide it. In fact he said he already had the surveyors up there and was going to sell it right out so Mr. Kefuss would have his money back. He said he thought he would have it back in thirty days and he would guarantee it would not be over ninety days. * * * We talked about the guarantee proposition again. Mr. Whitley said that he wouldn't want to give a bond or anything like that but his word was good and that he could sell this and would sell it. There wasn't any question about it at all. * * * Mr. Whitley talked considerably about the work he

had done in the work of subdividing property and his success. He told about several properties that he had sold, and from his statements he had been very successful in the work. Ninety days was the maximum time in which he said he could and would sell these lots. At that time Mr. Whitley stated that he had a partner in this deal."

Mr. Cook testified as to second visit:

"Mr. McDonald had stated that for the $25,000 Mr. Whitley would guarantee $100,000 profit to the party that put the $25,000 in. Then when we got to Mr. Whitley's office and that was put up to him in that way, he stated that the money might be anything up to $27,000; that he wouldn't say exactly $25,000; it would be between $25,000 and $27,000, would be the payment down on it; that as far as a guarantee of $100,000 was concerned, that he would say that of course they had to figure on some sidewalks and cinder roads and so forth, which they talked over at that time, and about what the expense of it would be, and that the party that put in the $25,000 would certainly get around four to one on his investment."

As to what occurred when Mr. Rumsey was present, Cook testified:

"On the next meeting, when Mr. Rumsey was there, Mr. Rumsey took it up with Mr. Whitley at that time about giving a written guaranty or a bond of some kind for the $100,000 profit that the man should receive on putting $25,000 into it, and there was some talk about that, and Mr. Whitley said he wouldn't sign up to any guaranty of that kind; that his word was good and he had said he would sell the lots, and while there might be that amount coming to the party that put $25,000 in, he wouldn't give a written guaranty to that effect: but that he would say that there was no question but what he would sell the lots within 90 days at least. In fact he figured on having all of them sold before the payment of May 10th of $15,000 would have to come in, and any way thirty days after that Mr. Kefuss could figure on putting the original money he put in of $25,000 back in the bank and figure on relying on his profits."

A circumstance shedding some light on the good faith of the defendants is an agreement on the part of defendants to pay Cook a commission on the sale. Both defendants knew that Cook was a relative and a confidential friend and adviser of plaintiff. Mr. Davey testified that he told plaintiff in August or September "that I was paying Mr. Cook for making this deal."

In my opinion, the proofs are convincing that plaintiff was told over and over again:

*First.* That this property was worth at least $250,000 for subdivision purposes.

*Second.* That Whitley was an adept at handling such properties and that he could and would within 90 days dispose of all the lots.

*Third.* That approximately $25,000 ready money was all that plaintiff would have to expend in its purchase, and that Whitley guaranteed that this would be returned to him within the 90 days.

*Fourth.* That defendants' reason for making the sale was because they were overloaded with such property and needed ready money to handle it and that they would sell only on condition that the Whitley company be given the sales agency for the subdivision.

I cannot conclude that these statements were mere promises or expressions of opinion. They were statements of material facts which plaintiff had a right to presume were within the knowledge of the defendant Whitley and of which the defendants knew the plaintiff was without knowledge.

Representations, if untrue, intended to be understood as mere promises or expressions of opinion, do not constitute fraud, especially when honestly made or entertained. But when uttered under circumstances importing that they are expected to be relied upon and acted upon promises will become undertakings and opinions treated as assertions of fact. While actionable fraud may not be predicated on erroneous predictions as to future conduct,—

"the speaker cannot escape liability on the plea that his statements related to the future if he misrepresented hopes as facts, contingencies as existing conditions, or contemplated arrangements as arrangements already agreed upon." 26 C. J. p. 1091.

"It is very generally held that fraud may be predicated of a promise accompanied by a present intention not to perform it and made for the purpose of deceiving the promisee and inducing him to act where otherwise he would not have done so." 12 R. C. L. p. 261.

The applicable rule is well stated in *Martin* v. *Veana Food Co.*, 153 Mich. 282. The plaintiff in that case was induced to purchase stock and become a district manager in the defendant company by representations made to him as to the condition of the company and what he would be able to earn. As to the latter, the court said:

"Coupled with the statement that the business was prosperous, this was a direct representation that a good manager ought to secure sales of 300 cases per month, and more. It was both an inducement to buy stock and a representation of its value."

It was further said:

"Undoubtedly, one may, without legal liability for results, permit another, for a consideration, to share his hopes, however adroitly the statement of his hopes may be phrased. He may not, by actual misstatement and without liability, induce the belief that the venture is without other risk than the usual risk of an established and prosperous business. The claim of plaintiff is that defendants represented as actual that which they hoped might become actual; that he paid his money, relying upon the representations. We are of opinion that it cannot be said, as matter of law, that plaintiff is entitled to no relief."

The case of *Allen* v. *Pulfer*, 159 Mich. 616, is instructive. The complainants were induced to incorporate the business in which they were engaged and to make an assignment of their stock to another

corporation on representations of increased profits, etc. This court, speaking through Mr. Justice Ostrander, said:

"Various representations were made to complainants by the defendant Pulfer to bring about the transfer of complainants' property, * * * which must be regarded as statements of fact and not of opinion, although, if the dealings had been between persons of equal or nearly equal intelligence in such matters, they might be regarded as expressions of opinion merely."

After quoting approvingly from the opinion of the trial court, wherein it is said:

"This confidence was born undoubtedly out of certain statements and assurances of the defendants. The evidence clearly shows that the negotiations lasted some little time, and that several interviews were had between one or more of defendants and the complainants, and that in these interviews the complainants were assured by the defendants that they, the complainants, were not making enough money, and that the defendants could make more money for them; that it was to the complainants' advantage to make the deal; that the defendants could advance lots of money to get out forms, etc. They were assured that 'your business will improve.' "

—this court said:

"The promises made to complainants have not been kept. That complainants were in fact deceived cannot be doubted. I am satisfied from the testimony that deceit—actual inducing of beliefs, based upon speculative statements accepted by complainants as true, affecting and intended to affect the action of complainants to their detriment and to the advantage of defendants—was practiced, and was intended to be practiced."

The effect of language of import similar to that here used was considered in *Pratt* v. *Allegan Circuit Judge*, 177 Mich. 558. The question discussed was whether the language used—

"was mere 'seller's talk,' or may it be said to be the representation of facts which might be relied upon by the purchaser and become an inducing cause of the trade?"

The court said:

"We are of opinion that the representation that property would readily sell in a certain market at a given price is the representation of an alleged fact, and, where relied upon as here stated, may be made the basis of a false representation."

In *McDonald* v. *Smith*, 139 Mich. 211, we quoted with approval the following from the opinion of Lord Bowen in *Smith* v. *Land and House Property Corp.*, L. R. 28 Ch. Div. 15:

"It is material to observe that it is often fallaciously assumed that a statement of opinion cannot involve the statement of a fact. * * * If the facts are not equally known to both sides, then a statement of opinion by the one who knows the facts best involves very often a statement of a material fact, for he impliedly states that he knows facts which justify his opinion."

We find it again quoted in *Pound* v. *Clum*, 204 Mich. 28, at page 33.

Counsel for the defendants rely on *Boston Piano & Music Co.* v. *Pontiac Clothing Co.*, 199 Mich. 141, wherein it was said:

"If misrepresentations of material facts are made to induce the contract, and do induce it, evidence of such misrepresentations may be given for the purpose of establishing fraud. But a promise of something to be done in the future is not a misrepresentation of an existing fact. Calling a promise a misrepresentation does not make it so."

It will be noted, however, that the rule stated was qualified by the language following:

"As stated, there was no claim that these promises were made in bad faith, with no intent to perform them and as a part of a scheme to defraud so as to

bring the case within *McDonald* v. *Smith*, 139 Mich. 211, and kindred cases."

The following cases from other jurisdictions will be found instructive: *Ansley* v. *Bank of Piedmont*, 113 Ala. 467 (21 South. 59, 59 Am. St. Rep. 122) ; *Goodwin* v. *Horne*, 60 N. H. 485; *Troxler* v. *New Era Bldg. Co.*, 137 N. C. 51 (49 S. E. 58) ; *Langley* v. *Rodriguez*, 122 Cal. 580 (55 Pac. 406, 68 Am. St. Rep. 70) ; *Adams* v. *Gillig*, 199 N. Y. 314 (92 N. E. 670, 32 L. R. A. [N. S.] 127, 20 Ann. Cas. 910). See, also, *Cerny* v. *Paxton & Gallagher Co.*, 10 L. R. A. (N. S.) 640 (78 Neb. 134, 110 N. W. 882) and note thereto, beginning on page 646; *Kohl* v. *Taylor*, 35 L. R. A. (N. S.) 175 (62 Wash. 678, 114 Pac. 874) ; 20 Cyc. p. 27.

I have no doubt under the proofs that these statements were known to defendants to be untrue and that they were relied upon by plaintiff as being true and that they controlled his action in making the purchase. The testimony quoted, that of McDonald and Whitley, in which they seek to explain what occurred, the memoranda furnished plaintiff, the delay occasioned in securing approval of the plat, the feeble and ineffectual effort made to dispose of the lots,—all these are convincing to my mind of the studied effort made to induce plaintiff to relieve the defendants of an investment quite certain to result in loss, owing to the conditions then apparent to men of experience in the subdivision business.

Were the representations made relied upon by the plaintiff? Credulous he undoubtedly was. The facts presented appealed to his cupidity. The suggestion that he should have been suspicious of a proposition by which so much "easy money" was to be secured is met by the clever excuse given by McDonald and Whitley as to why they were willing to let him in on the deal. McDonald's first statement was that Whitley "had overloaded himself," while Whitley told him

"that he didn't have the money to go ahead and plat it and sell it off, but he was perfectly willing to take somebody in." I do not think it can be said that because plaintiff was impelled to enter into the contract in the hope of receiving large profits therefrom, or the fact that he gave the matter due consideration, ought to or does deprive him of the right to insist that he was induced to enter into the contract by the fraudulent representations of the defendants. These considerations should cause us to scan the testimony more closely, to require convincing proof as to the fraud claimed, but should not be deemed sufficient ground for refusing relief if we are satisfied by such proof that he would not have entered into the contract but for the fraud practiced upon him. Perhaps a wiser man, a man of more experience in financial affairs, would have concluded that the proposition put up to him was "too good," the profits, to be made on the investment required, larger than an honest deal would justify. It apparently so appealed to Mr. Rumsey, and it is significant that plaintiff made no effort to satisfy Rumsey that his (Rumsey's) judgment was at fault, but concealed from him his determination to make the investment. I am satisfied that but for the positive assurances of McDonald and Whitley as to the value of the property for the purpose for which it was to be used, the amount he would be required to invest, the certainty of his profit and the speedy return of the money invested, he would not have executed the contract of purchase. Stress is laid on the fact that plaintiff had the independent advice of Mr. Rumsey and disregarded it. From it I think an inference to the contrary may fairly be drawn. As was said in *Yanelli* v. *Littlejohn,* 172 Mich. 91, at page 104:

"It appears that plaintiff did not rely upon the advice and statements of Barassa, the attorney, but acted in disregard of such advice. Had his attorney advised him to purchase the land, and had he relied

upon such advice, then the defendant would not have been liable; but the fact that Barassa advised him not to purchase, and that he did not follow the advice, might be urged as evidence of the strength of the representations claimed to have been made by the defendant. The question is not, Was he warned? but Was he deceived and defrauded by the defendant?"

It is insisted that plaintiff waived the right to rescind by his subsequent conduct. It is true that he executed notes in payment of sums remaining due after the 90 days and as to some of these transactions he had the benefit of his attorney's advice, but it is not apparent that he on any of these occasions doubted that Whitley would ultimately sell the lots as he had undertaken to do. He was continually lulled into security by the promises made and the excuses offered. I think the facts do not establish a waiver on his part.

Was the decree against the defendant Davey justified by the proofs? The equity in the property was owned by Whitley and Davey jointly. Whitley employed McDonald to sell it and later, in writing, agreed to pay Cook a commission on its sale. Whitley stated that he would have to submit the proposed deal to his partner, and when the contract was executed, if not before, he knew of Exhibit 2 and the understanding of plaintiff relative thereto. He thereafter accepted one-half of the $10,000 down payment made by plaintiff. It is not necessary that the false representations should have been made by Mr. Davey personally, or in his presence or by his authority. If he understood what was being said and done to induce plaintiff to make the purchase, he is responsible for false representations made in furtherance thereof. *McDonald* v. *Smith, supra.* Where there is evidence that parties are acting in collusion, "Everything said, done, or written by any one of the parties to the combination, in furtherance of the common purpose, is deemed the act of all." *Gumberg* v. *Treusch,* 103 Mich. 543, 554.

In my opinion, the fair inference to be drawn from the proofs is that Mr. Davey knew all about the deal with plaintiff and, having accepted the fruit of the fraud, he may not complain of a decree which so far as possible places the parties *in statu quo*. *French v. Ryan*, 104 Mich. 625; 27 C. J. 7, § 120 *et seq.*

The decree entered will be affirmed, with costs to plaintiff.

FELLOWS, C. J., and MCDONALD, BIRD, and STEERE, JJ., concurred with SHARPE, J.