NOT RECOMMENDED FOR PUBLICATION
File Name: 07a0196n.06
Filed: March 13, 2007

No. 06-1196

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

LIAC, INC.,                                          )
                                                    )
    Plaintiff-Appellant,                            )
                                                    )
v.                                                  )    ON APPEAL FROM THE UNITED
                                                    )    STATES DISTRICT COURT FOR THE
FOUNDERS INSURANCE CO.,                             )    EASTERN DISTRICT OF MICHIGAN
                                                    )
    Defendant-Appellee.                             )
                                                    )    OPINION
_____             )

Before: SILER, MOORE, and GILMAN, Circuit Judges.

**RONALD LEE GILMAN, Circuit Judge.** In 2000, LIAC, Inc. and Founders Insurance

Co. signed a Managing General Agency Agreement (MGA Agreement), pursuant to which LIAC

agreed to sell nonstandard automobile insurance policies underwritten and issued by Founders to

Michigan residents. The relationship was short-lived. After Founders notified LIAC in 2001 of its

intent to terminate the Agreement, LIAC filed a complaint in Michigan state court, alleging

fraudulent inducement and breach of contract. Founders removed the case to federal court, after

which it filed a motion for summary judgment. The district court granted the motion as to both of

LIAC's claims. For the reasons set forth below, we **AFFIRM** the judgment of the district court as

to LIAC's fraudulent-inducement claim, **REVERSE** the judgment as to the breach-of-contract claim, and **REMAND** the case for further proceedings consistent with this opinion.

## I.   BACKGROUND

LIAC is an insurance broker in the state of Michigan that focuses on nonstandard no-fault automobile insurance policies that are designed for customers with poor driving records who would not otherwise qualify for standard-rate policies.  Founders is an Illinois-based insurance company that issues such policies as part of its business.  These policies typically provide coverage for only six months.  Insurers such as Founders compensate brokers like LIAC by paying commissions based on the installment payments actually collected on the policies originated by the broker.  The so-called persistency rate—meaning the number of policies paid in full over the six-month term compared to the total number of policies sold—therefore directly affects a broker's profitability.  Average persistency rates for nonstandard no-fault insurance range from 30 to 60 percent.

In early 2000, Founders and LIAC began negotiating an agreement whereby LIAC would sell Founders's policies to customers domiciled in Michigan.  The parties signed the MGA Agreement in March of 2000.  LIAC agreed to solicit, bind, and service nonstandard automobile policies for Michigan residents consistent with Founders's underwriting guidelines. Founders in turn committed to pay LIAC a commission based upon a percentage of the insurance premiums remitted.  Although the MGA Agreement did not identify LIAC as Founders's exclusive broker in Michigan, the parties did agree that Founders would not appoint any other producer or managing general agent in Michigan at a commission rate equal to or lower than the rate paid to LIAC.

Among the key terms in the MGA Agreement was a merger clause, which read as follows:

Both [Founders] and [LIAC] acknowledge that this Agreement is the entire agreement between them relating to their contemplated business transactions and that they have not relied upon any promises or representations, oral or written, which have not been included in this Agreement. [Founders] and [LIAC] desire that this Agreement supersede any prior agreements between them.

Section 26 of the MGA Agreement further provided that, at the request of either party, executives of Founders and LIAC "shall meet at a mutually convenient place and time to discuss suggestions, concerns, issues, and the like." A final term of relevance is the choice-of-law clause, which provided that "this Agreement shall be governed by Illinois law, without regard to principals [*sic*] of choice of law."

Almost immediately, the relationship between the parties grew strained. LIAC complained that Founders was failing to handle the volume of business that LIAC generated in a timely manner, despite oral representations that it was equipped to do so. This failure allegedly caused the persistency rates on policies originated by LIAC to drop to between 5 and 20 percent, well below industry averages. In turn, Founders characterized LIAC as a "demanding, high maintenance partner" that unreasonably complained about multiple aspects of the relationship. The relationship deteriorated to the point that, in April of 2001, Founders sent LIAC a letter stating that it intended to terminate the MGA Agreement as of September 30, 2001, but also that it hoped to negotiate "another mutually satisfactory Agreement."

LIAC filed suit against Founders in the Wayne County (Michigan) Circuit Court in July of 2001. The complaint alleged fraudulent inducement and breach of contract, and sought damages "for whatever amount in excess of $25,000 [LIAC] is entitled," along with costs and fees. Founders

removed the case to the United States District Court for the Eastern District of Michigan in August of 2001.  After discovery, Founders moved for summary judgment.

In a decision issued in February of 2003, the district court determined that Michigan law applied to the fraudulent-inducement claim and that Illinois law applied to the breach-of-contract claim.  This choice-of-law determination is undisputed on appeal.  The district court then granted Founders's motion for summary judgment as to the former claim, but denied it as to the latter.  As part of its decision, however, the district court invited Founders to file a renewed motion for summary judgment that addressed "in full" LIAC's argument that allegedly omitted terms in the MGA Agreement permitted the court to use the doctrine of good faith and fair dealing to construe the contract in light of the parties' intent.

Founders subsequently filed a renewed motion for summary judgment on the breach-of-contract claim, which the district court granted in March of 2004.  LIAC filed a notice of appeal the following month, but this court dismissed the appeal for lack of jurisdiction because the district court had not yet ruled on a counterclaim that Founders had raised against LIAC.  After the parties agreed to dismiss the counterclaim by stipulation in December of 2005, LIAC brought this timely appeal.

## II.  ANALYSIS

### A.     Standard of review

We review the district court's grant of summary judgment de novo.  *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006).  Summary judgment is proper where no genuine issue of

material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

**B.** **Fraudulent inducement**

LIAC contends that the district court erred in granting summary judgment to Founders on LIAC's claim of fraudulent inducement. According to LIAC, Founders fraudulently induced LIAC to enter the MGA Agreement by deliberately concealing facts and misrepresenting Founders's ability to handle the volume of business that LIAC expected to generate. The two parties held meetings in both Illinois and Michigan to negotiate the MGA Agreement. In its complaint, LIAC alleges that, during these meetings, Founders representatives informed LIAC that Founders was knowledgeable about Michigan's no-fault insurance law, that it had sufficient staff and resources to handle and promptly service the 3,000 policy applications that would be generated each month, and that it averaged an eight-day turnaround time between the date a customer filled out an application and the date that policy materials were mailed to the customer.

LIAC contends that each of the above assertions was false. Further, LIAC alleges that Founders knew these assertions were false at the time, knew that LIAC would rely on them, and deliberately used them to induce LIAC to enter the MGA Agreement.

Founders denied that it made any false assertions. It argued that LIAC executives had the opportunity to verify any of Founders's precontract representations and that LIAC in fact admitted during discovery that its executives had done so. According to Founders, the merger clause in the MGA Agreement establishes that LIAC was not relying on any promises or representations not included in the Agreement.

The district court, relying on *UAW-GM Human Resource Center v. KSL Recreation Corp*., 579 N.W.2d 411 (Mich. Ct. App. 1998), agreed. *KSL Recreation* held that where the parties to an agreement include an integration or merger clause in their written contract, "it is conclusive and parol evidence is not admissible to show that the agreement is not integrated except in cases of fraud that invalidate the integration clause or where an agreement is obviously incomplete 'on its face' and, therefore, parol evidence is necessary for the 'filling of gaps.'" 579 N.W.2d at 418 (citing 3 Corbin, Contracts § 578). The district court noted that the Michigan Supreme Court had recently cited *KSL Recreation* with approval in *Archambo v. Lawyers Title Ins. Corp.*, 646 N.W.2d 170, 177 (Mich. 2002), an opinion discussing the importance of adhering to a written contract.

After finding that both parties were "sophisticated businessmen," the district court ruled that it was unreasonable for LIAC to rely on any representation not included in the MGA Agreement. LIAC's fraudulent-inducement claim, according to the district court, was insufficient to "vitiate the merger clause."

Under Michigan law, the tort of fraudulent inducement "occurs where a party materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon." *Samuel D. Begola Servs., Inc. v. Wild Bros.*, 534

N.W.2d 217,219 (Mich. Ct. App. 1995) (citing *Kefuss v. Whitley*, 189 N.W. 76, 81 (Mich. 1922)).

A contract procured by fraud may be voided by the defrauded party. *Begola Servs*., 534 N.W.2d at

219. Because fraudulent inducement is a tort claim, not a contract claim, parol evidence is generally

admissible. *See KSL Recreation*, 579 N.W.2d at 418. But only certain types of fraud serve to void

a contract where the contract contains a merger clause. As the *KSL Recreation* court explained:

> In other words, while parol evidence is generally admissible to prove fraud, fraud that relates solely to an oral agreement that was nullified by a valid merger clause would have no effect on the validity of the contract. Thus, when a contract contains a valid merger clause, the only fraud that could vitiate the contract is fraud that would invalidate the merger clause itself, i.e., fraud relating to the merger clause or fraud that invalidates the entire contract including the merger clause.

*Id*. at 419 (citing 3 Corbin, Contracts § 578).

The key question regarding contracts that contain a merger clause is whether one party

justifiably relied on the representations of the other where the written agreement not only failed to

include those representations, but clearly stated that by signing the contract the parties were agreeing

that the written document made up their entire agreement. *See Star Ins. Co. v. United Commercial*

*Ins. Agency, Inc.*, 392 F. Supp. 2d 927, 929-30 (E.D. Mich. 2005) (holding that the counter-plaintiff

insurance company could raise a fraudulent-inducement claim despite the presence of a merger

clause in the disputed contract). Moreover,

> [t]here is an important distinction between (a) representations of fact made by one party to another to induce that party to enter into a contract, and (b) collateral agreements or understandings between two parties that are not expressed in a written contract. It is only the latter that are eviscerated by a merger clause, even if such were the product of misrepresentation. It stretches the [*KSL Recreation*] ruling too far to say that any pre-contractual factual misrepresentations made by a party to a contract are wiped away by simply including a merger clause in the final contract.

*Id*. at 928-29.

The merger clause in the present case accordingly does not preclude consideration of all extrinsic evidence in reviewing LIAC's fraudulent-inducement claim. Unfortunately, we cannot determine from the rather abbreviated discussion by the district court what evidence it considered in concluding that the claim failed on its merits.

LIAC opposed Founders's motion for summary judgment by submitting deposition testimony from two of LIAC's executives (Richard Clark and John Wolding) and two of Founders's senior employees (Steven Bosey and David Mirza). Bosey, Founders's vice president of marketing at the time of the MGA Agreement, testified in his deposition that Founders was "not prepared" for the nature and volume of LIAC's business:

> [W]e were not prepared and we did not gear up to handle this business. . . . It was a different kind of business so it took longer to — for the underwriters to issue. . . . They are not used to it. You know, it just — initially it was — I wouldn't call it a disaster, but it was — you know, we weren't doing what we were supposed to do.

Bosey also testified that Founders's president, Dave Lathrup, told LIAC that "[Lathrup] was committed to a long-term relationship . . . and he actually cited . . . numerous agents in Illinois that [Founders] had been doing business with for many, many years as an example."

LIAC argues on appeal, as it did in the district court below, that Founders misled LIAC's executives by representing that Founders was familiar with Michigan's no-fault insurance law, that Founders had sufficient staff to service in a timely fashion the volume of business that LIAC projected it would generate, and that Founders had the physical resources to handle the "rollover" of LIAC's existing business from its previous insurer. What is missing from LIAC's argument on

appeal, however, is a discussion of how Founders's alleged misrepresentations constitute fraud either as to the merger clause itself or as to the contract as a whole. LIAC cofounder John Wolding contended in his deposition testimony that LIAC "didn't like some of the stuff that was in [the MGA Agreement]," but that Founders told them it was "just boilerplate" and "had to be done that way." Wolding did not identify which sections were identified specifically as concerns to LIAC. Nothing in the record, in fact, indicates that LIAC ever questioned the presence or purpose of the merger clause. Wolding further admitted that he signed the MGA Agreement notwithstanding the offending language. Consequently, we conclude that LIAC has not provided a basis for finding that Founders fraudulently induced LIAC's acceptance of the merger clause.

A closer question is presented as to whether Founders's alleged misrepresentations constitute fraud as to the MGA Agreement as a whole. The entire Agreement comprises 13 pages, of which only five deal with the substantive obligations of the parties. Founders's duties are set forth with particular brevity. LIAC's argument appears to be that Founders induced LIAC to enter an agreement that was materially different from the contract it expected, based on Founders's alleged misrepresentations. Construed in this manner, LIAC's argument could be understood as going to the contract as a whole.

But the record does not support such an interpretation. All of LIAC's arguments go to the quality and extent of Founders's performance, not to the absence of such performance. LIAC never attempted to meet with Founders to discuss the performance problems, despite LIAC's right under the MGA Agreement to have an "executive-level meeting" at which the parties could "discuss suggestions, concerns, issues, and the like." Common indicia of fraudulent inducement are also

absent here: the MGA Agreement is not extremely one-sided, the parties do not have a family relationship, and LIAC does not allege that its principals were manipulated because of their age or health conditions. *See Tocco v. Tocco*, 409 F. Supp. 2d 816, 827 (E.D. Mich. 2005) (determining that the plaintiff-grandfather demonstrated a strong likelihood of success on his fraudulent-inducement claim where his grandson "tricked" him into executing a closing document for the sale of property in exchange for worthless promissory notes).

LIAC instead admitted that it had read and understood the MGA Agreement before signing. As the party concerned about Founders's future performance, LIAC was best suited to demand that the MGA Agreement include explicit provisions reiterating all of the oral representations that Founders allegedly made. The lack of such provisions is all the more inexplicable because LIAC admitted that it had previously experienced difficulties with application-processing time under a contract with a different financial services company. In sum, LIAC failed to raise a genuine issue of material fact in support of its claim that Founders fraudulently induced LIAC's agreement to the contract as a whole. We therefore affirm the district court's decision on that claim.

## C.    Breach of contract

LIAC also argues that the district court erred in granting summary judgment to Founders on LIAC's breach-of-contract claim. Specifically, LIAC contends that the MGA Agreement is missing a number of essential terms. It makes this argument despite the merger clause contained in the MGA Agreement, and claims that these missing terms necessitate consideration of extrinsic evidence in order to construe the contract in keeping with the parties' intent at the time it was signed. Most notably, the MGA Agreement fails to impose any affirmative duty or obligation on Founders to issue

insurance policies, although it explicitly requires LIAC to "solicit, bind, and service" nonstandard policies and prohibits LIAC itself from underwriting or issuing policies. Founders's express obligations under the MGA Agreement are to pay LIAC a commission for "all services rendered and expenses incurred under this Agreement," to pay a portion of a processing fee charged against an insured's partial payment of the total premium due, and to refrain from appointing "any producer or managing general agent to solicit business in . . . Michigan at a commission rate equal to or lower than" that paid to LIAC. The MGA Agreement further requires Founders to provide an adequate supply of policy forms and endorsements to LIAC.

But the MGA Agreement fails to set a deadline for Founders to issue policies and mail invoices. LIAC contends, however, that the parties clearly contemplated that Founders would act in good faith to meet industry standards in this regard. As a result, LIAC argues that when Founders did not process applications promptly or mail invoices in time for the insured to pay before the next premium due date, Founders breached the MGA Agreement.

Founders's response rests heavily on the presence of the merger clause in the MGA Agreement. The merger clause states in no uncertain terms that the MGA Agreement represented the "entire agreement" between the parties and that it "supersede[d] any prior agreements between them." Founders asserts that LIAC's inability to identify any specific provision of the MGA Agreement that Founders breached dooms the breach-of-contract claim on appeal. And even if the merger clause does not bar consideration of extrinsic evidence, Founders reiterates that LIAC's executives testified not only that they had the opportunity to verify Founders's precontract assertions about staffing levels and familiarity with Michigan insurance law, but that they in fact did so.

Founders's argument, in other words, is that LIAC got the contract it negotiated for, but is now seeking to have the courts rewrite the contract on more favorable terms.

At oral argument, Founders also contended for the first time that we should find that the parties never had a "meeting of the minds," thus obviating the contract between them. Founders forfeited this argument, however, by failing to raise it at any prior point in the proceedings. *See United States v. Boumelhem*, 339 F.3d 414, 428 (6th Cir. 2003) (finding that the appellee forfeited an argument that it had failed to raise below and on which the record was not developed). More to the point, the argument is specious. Founders was the primary drafter of the MGA Agreement, and is thus in a poor position to argue its invalidity. *See Diversified Energy, Inc. v. Tenn. Valley Auth.*, 223 F.3d 328, 339 (6th Cir. 2000) ("It is well-settled that courts are to construe ambiguities against the drafter of a contract . . . ."). We will accordingly discuss this argument no further.

The Illinois parol evidence rule "generally precludes evidence of understandings, not reflected in a writing, reached before or at the time of its execution which would vary or modify its terms." *J&B Steel Contractors, Inc. v. C. Iber & Sons, Inc.*, 642 N.E.2d 1215, 1217 (Ill. 1994). If, however, the written agreement is incomplete and therefore only partially integrated, the parol evidence rule would not preclude consideration of additional consistent terms. *Id*. at 1220. Under Illinois law, which governs LIAC's breach-of-contract claim, merger or integration clauses generally operate to supersede all prior agreements. *Barille v. Sears, Roebuck & Co.*, 682 N.E.2d 118, 123 (Ill. App. Ct. 2002) ("It is well settled under the doctrine of merger and the parol evidence rule that a written agreement which is complete on its face supersedes all prior agreements on the same subject

matter and bars the introduction of evidence concerning any prior term or agreement of that subject matter.")

A merger clause prevents a court from considering evidence outside the "four corners" of the contract to construe the contract terms unless one or more of those terms is ambiguous on its face. *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 885 (Ill. 1999) ("[W]here parties formally include an integration clause in their contract, they are explicitly manifesting their intention to protect themselves against misinterpretations which might arise from extrinsic evidence."). The Illinois Supreme Court elaborated on this point as follows:

> During contract negotiations, a party may propose terms, conditions, and provisions which are ultimately rejected in order to reach a compromise with the other party. That other party, of course, may do the same. The integration clause makes clear that the negotiations leading to the written contract *are not* the agreement. Accordingly, considering extrinsic evidence of prior negotiations to create an "extrinsic ambiguity" where *both* parties *explicitly* agree that such evidence will *not* be considered ignores the express intentions of the parties and renders integration clauses null.

*Id.* (emphasis in original).

LIAC does not argue that the merger clause is ambiguous or that it was fraudulently induced to sign the MGA Agreement despite the presence of the clause. In fact, LIAC cofounder Richard Clark admitted in his deposition testimony that he "vaguely" looked at the MGA Agreement before he signed it, that he had the opportunity to ask questions about it, and that he agreed with its terms when he signed it. LIAC nevertheless contends that the contract was not fully integrated, thereby warranting the consideration of parol evidence that is consistent with the MGA Agreement's written terms and provides proof that Founders breached the contract.

"The rule in cases not governed by the [UCC] is that only the subject writing may be considered to determine the integration question." *J&B Steel*, 642 N.E.2d at 1218. Here, the MGA Agreement requires that LIAC sell insurance policies, notify Founders of any claims against a Founders-issued policy, comply with all applicable laws and regulations, notify Founders of any violation of a law or regulation, and maintain competent and trained staff and sufficient resources to meet its contractual obligations. The MGA Agreement further provides for LIAC and Founders to maintain and reconcile records of transactions involving insurance policies, and for Founders to pay commissions to LIAC. Section 2.B.i. of the MGA Agreement specifies that it shall be Founders's "exclusive duty" to "underwrite, issue, endorse, renew, cancel, rescind, or reinstate policies of insurance or to adjust claims on any such policies."

Among the things that the MGA Agreement does not specify are whether Founders has any discretion over the timetable for issuing policies or mailing invoices for payment, and whether there is a minimum or maximum required number of policies that LIAC must sell. LIAC contends that the MGA Agreement's silence on these questions must be understood as vesting Founders with discretion and that, accordingly, the implied covenant of good faith and fair dealing governs Founders's contractual performance. In response, Founders reiterates the conclusion of the district court—namely, that under Illinois law, the covenant of good faith and fair dealing is not an independent source of duties and does not create a cause of action.

The Seventh Circuit considered the effect of this covenant in *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443-45 (7th Cir. 1992), a case involving a dispute between a licensor and its licensee over a medical device. After noting that in Illinois "every contract implies good faith and

fair dealing between the parties to it," *id*. at 1443, the Seventh Circuit concluded that the covenant "guides the construction of explicit terms in an agreement." *Id*. Where an agreement "is susceptible of two conflicting constructions, one which imputes bad faith to one of the parties and the other does not, the latter construction should be adopted." *Martindell v. Lake Shore Nat'l Bank*, 154 N.E.2d 683, 690 (Ill. 1958).

Founders contends that adopting LIAC's view of the contract would necessarily impute bad faith to Founders. We disagree. The explicit terms of the MGA Agreement vest Founders with the "exclusive duty" of issuing and underwriting insurance policies to Michigan residents who were solicited by LIAC. But the MGA Agreement does not specify when Founders must issue the policies or mail the invoices. We should therefore look to the implied covenant of good faith and fair dealing in order to construe the extent of Founders's obligations under the MGA Agreement. The covenant limits Founders's discretion, such that it "must exercise that discretion reasonably and with proper motive, and may not do so arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Dayan v. McDonald's Corp.*, 466 N.E.2d 958, 972 (Ill. App. Ct. 1984).

Founders seems to be arguing that it could exercise its "exclusive duty" to issue policies and mail invoices at whatever pace it saw fit, or not at all. This is contrary to the implied covenant of good faith and fair dealing under Illinois law. Taking the evidence in the light most favorable to LIAC, as we are required to do in evaluating Founders's motion for summary judgment, we conclude that LIAC has raised a genuine issue of material fact as to whether Founders breached the MGA Agreement.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court as to

LIAC's fraudulent-inducement claim, **REVERSE** the judgment as to the breach-of-contract claim,

and **REMAND** the case for further proceedings consistent with this opinion.