JAC HOLDING ENTERPRISES, INC., Wynnchurch Capital, Ltd., and Wynnchurch Capital Partners II, L.P., Plaintiffs,

v.

ATRIUM CAPITAL PARTNERS, LLC, Annex Capital Management, LLC, Daniel J. Smoke, Alexander P. Coleman, Robert E. Fowler, III, Dale L. Cheney, Stephen Morrey, and Sergey Agafonkin, Defendants.

Case No. 12–15450.

United States District Court,
E.D. Michigan,
Southern Division.

Feb. 10, 2014.

David M. Saperstein, Karen Libertiny Ludden, Maddin, Hauser, Southfield, MI, Joshua W. Mahoney, Matthew A. Bills, Matthew M. Killen, Michael P. Conway, Grippo & Elden, Chicago, IL, for Plaintiffs.

Robert W. Forman, Robert W. Forman, Forman & Shapiro LLP, New York, NY, Matthew P. Allen, Matthew F. Leitman, Thomas W. Cranmer, Miller Canfield Paddock & Stone, PLC, Troy, MI, Paul D. Hudson, Miller, Canfield, Paddock & Stone, P.L.C., Kalamazoo, MI, for Defendants.

### *OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS, DISMISSING CERTAIN CLAIMS, AND SCHEDULING CASE MANAGEMENT CONFERENCE*

DAVID M. LAWSON, District Judge.

The plaintiffs in this case allege that the defendants' misconduct caused them to pay considerably more for a manufacturing company than it was actually worth. Their lengthy and detailed complaint pleads various claims of fraud, conspiracy, breach of contract, and statutory violations under federal, Michigan, and Delaware law. This matter is before the Court on the motions to dismiss filed by three groups of defendants. They argue that (1) the complaint fails to allege fraud with the

specificity required under Federal Rule of Civil Procedure 9(b) and the heightened pleading standards applicable to federal securities law claims, in large part because the defendants contend that it fails to identify which of the specific defendants made particular representations; (2) the claims sounding in fraud are barred by the "merger clause" in the purchase agreement, which precludes reasonable reliance on the shady statements; and (3) the claims sounding in breach of contract are barred, at least as to some defendants, because those defendants were not parties to the agreement. The Court heard oral argument in open court on June 4, 2013 and now concludes that because certain defendants were not parties to the sale and merger agreement, the breach of contract claims cannot proceed against them. Nor does the complaint plead a valid claim under the Delaware Securities Act, because the transaction and the parties are not connected to Delaware in any meaningful way. However, the complaint does state plausible claims for common law fraud, federal and Michigan state statutory securities fraud, secondary liability under the securities fraud regulations, conspiracy and concert of action as to the intentional fraud claims, and breach of contract as to defendants Atrium and Coleman (as trustee). Therefore, the Court will grant in part and deny in part the motions to dismiss, and dismiss the breach of contract claims against defendants Annex, Cheney, Coleman (individually), Fowler, Morrey, Agafonkin and Smoke. The motion will be denied in all other respects.

## I.

Because this is a motion to dismiss, the following facts are taken either from the complaint or as they appear to be undisputed by the parties. The complaint spans 115 pages and 436 paragraphs. The purchase agreement between the parties was attached to the complaint and is considered a part of the pleadings because it governs the rights and obligations of the parties to it. *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir.2007) (holding that "documents attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss" (citing Fed. R.Civ.P. 10(c))).

### A. Background

Plaintiff JAC Holding Enterprises, Inc. (JAC) makes roof racks and side rails for motor vehicles, which it sells to various manufacturers in the United States and Europe. Plaintiff Wynnchurch Capital, Ltd. makes investment decisions on behalf of plaintiff Wynnchurch Capital Partners II, L.P., which is now the majority shareholder of JAC. Under a 2010 sale and merger agreement, Wynnchurch paid $87 million to buy JAC from the defendants, chiefly Atrium Capital Partners, LLC, which was then JAC's largest shareholder. The individual defendants were at the time principals, shareholders, managers, and employees of JAC, Atrium, or Atrium's managing enterprise, defendant Annex Capital Management, LLC. Wynnchurch alleges that the defendants executed a "massive fraud" by systematically fabricating sales, concealing losses and liabilities, and engaging in other financial shenanigans in order to inflate JAC's apparent earnings and convince Wynnchurch to pay much more than JAC was actually worth.

The complaint alleges that the defendants engaged in a systematic plot to misrepresent the financial condition of JAC in the months leading up to the closing of the sale, and as a result "JAC's actual value at the time of closing was approximately $50 million less than what the Conspirators had represented and what they had induced the Buyers to pay." Compl. ¶ 167. The complaint alleges fourteen specific

misrepresentations, omissions, or deceptive acts in support of its claims of common law fraud, statutory securities fraud violations, and breach of the warranties made in the purchase agreement.

Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin made a series of material misrepresentations and omissions regarding JAC's operations and financial conditions between July 2010 and December 2010. As alleged above, Defendants engaged in a scheme to hide from the Buyers the fact that JAC's financial condition had materially and significantly deteriorated. Specific material misrepresentations and omissions made as part of this scheme include: (i) Defendants misrepresented the financial results of JAC in November 2010 and withheld the November 2010 financial statements of JAC's European subsidiary under false pretenses; (ii) Defendants concealed the Intercompany Account imbalance; (iii) Defendants recorded certain chargeback amounts to JAC's European subsidiary and concealed the fact that the subsidiary rejected the chargebacks; (iv) Defendants concealed the circumstances of its tooling deal with KIA and misrepresented financial statements that failed to reserve against foregone tooling charges; (v) Defendants misrepresented JAC's inventory amounts in 2010 and misrepresented the counts that took place; (vi) Defendants misrepresented financial statements that failed to account for giveback and write-off amounts to its customer, Chrysler; (vii) Defendants hid the condition of a key piece of equipment, the W 164 tool for the Hydroform Press; (viii) Defendants stretched payables in Europe and misrepresented to the Buyers that payments were made within historical and acceptable time periods; (ix) Defendants misrepresented tooling costs associated with the bid on a customer project and failed to reserve against them in statements provided to the Buyers; (x) Defendants omitted reserves from financial statements disclosed to the Buyers related to a customer warranty claim and misrepresented the nature of the charge; (xi) Defendants omitted material reserve amounts from its financial statements related to JAC's self-insured medical coverage; (xii) Defendants concealed the condition of its Saline press in its representations to Buyers; (xiii) Defendants concealed the fact that JAC relocated customer work without the customer's authorization causing JAC to incur significant costs as a result of the move; and (xiv) Defendants concealed the settlement over its state sales tax audit.

Compl. ¶ 169. With respect to items (ix) and (x), the complaint only accuses "the Conspirators" of hiding or misstating the financial details of the items at issue. As to the rest of the allegations, the complaint names at least one, and in most cases several of the individual defendants who allegedly concealed or made the decisions to conceal the facts.

### B. Allegations in detail

#### 1. The Defendants

##### a. Atrium Capital Partners, LLC

"[Atrium Capital Partners, LLC] was JAC's controlling shareholder at the time the transaction at issue closed and is a party to the Agreement." Compl. ¶ 5. The agreement identified the "Major Stockholders" in JAC at the time of the closing, and represented that they beneficially owned approximately 68.1% of the outstanding common stock of JAC. The "Company Stockholders" (also referred to as "Major Stockholders") were identified as: Atrium Capital Partners LLC, 654,015 shares; Alexander P. Coleman Family

Trust, 34,000 shares; and Amant Dewan, 12,000 shares.

#### b. *Annex Capital Management, LLC*

"[Annex Capital Management, LLC] was the Manager of Atrium at the time of the closing and signed the Agreement on Atrium's behalf." Compl. ¶ 6. "Annex Capital wholly controlled Atrium and controlled JAC through Atrium." *Ibid.*

#### c. *Alexander P. Coleman*

Alexander P. Coleman was a managing partner of Annex and spoke for Annex. Coleman had several roles and interests in the merger:

> Coleman is the former Chairman of the Board of JAC. In January 2009 he entered into a Compensation Agreement with JAC, in which he was paid a percentage of JAC's earnings each year through quarterly retainers. Coleman assigned his responsibilities under that agreement to Annex in December 2010. Coleman is also the Trustee of the Alexander P. Coleman 2010 Grantor Retained Annuity Trust U/A Dated November 23, 2010 ..., which was one of JAC's major stockholders at the time of closing and is a party to the Agreement. Coleman signed the Agreement on behalf of JAC, Annex, and [the] Trust.

Compl. ¶ 8. The complaint also alleges that as the signer of the agreement, on behalf of JAC, Atrium, and his trust, Coleman made certain express representations and warranties under the terms of the agreement:

> Annex and Coleman (individually and on behalf of [his] Trust) ... made representations and warranties in the Agreement to ... cover up their fraudulent scheme.... The specific frauds related to the intercompany account balance meant the financial statements the Conspirators provided to the Buyers were not prepared in accordance with GAAP ... nor did they fairly represent the financial position of JAC ... as specified

in Section 2.7(a) of the Agreement; the books, records, and accounts of JAC ... were not accurate and complete in all material respects ... as specified in Section 2.7(b) of the Agreement; there existed undisclosed liabilities of the type specified in Section 2.7(c) ... and there had been material adverse changes to [JAC's financial position] since December 31, 2009, as specified in Section 2.8(a) of the Agreement; there existed material contracts to which JAC and its subsidiaries were parties but which were not specified in Section 2.15(a) through (e) of the Agreement; and JAC and its subsidiaries had not fully complied with certain foreign tax matters specified in Section 2.19(f) of the Agreement.

Compl. ¶ 72.

#### d. *Dale L. Cheney*

Dale L. Cheney "was a Principal and agent of Annex during all relevant periods." Compl. ¶ 10. "Prior to the sale of JAC to the Buyers, Cheney was paid by JAC's subsidiary, JAC Products, Inc., as an independent consultant pursuant to a Consulting Agreement." *Ibid.* "Cheney was paid a 'transaction bonus' of $1.45 million for the sale of JAC." *Ibid.*

#### e. *Robert E. Fowler*

Robert E. Fowler, III "is a Managing Partner of Annex and was Annex's agent during all relevant periods. Fowler was also a director of JAC." Compl. ¶ 9. "Fowler owned significant stock options in JAC and was paid over $729,000 for his stock options when JAC was sold." *Ibid.*

#### f. *Stephen Morrey*

Stephen Morrey "is a current or former Operating Partner of Annex, and he was the CEO and President of JAC Products until January 2011." Compl. ¶ 12. "Morrey acted as an agent of Annex prior to the sale of JAC to the Buyers." *Ibid.*

### g. Sergey Agafonkin

Sergey Agafonkin "was an employee or consultant at JAC prior to the sale of JAC to the Buyers. Agafonkin acted as an agent of Annex during all relevant periods." Compl. ¶ 13. "In 2010, Annex approved the grant of thousands of stock options in JAC to Agafonkin to thank him for his service and give him an even greater incentive to fraudulently inflate JAC's value in order to make sure it sold at the highest possible price." *Ibid.*

### h. Daniel J. Smoke

Daniel J. Smoke "was the Chief Financial Officer of JAC until he was terminated for cause on December 21, 2010." Compl. ¶ 7. "Smoke acted as an agent of Annex during all relevant periods." *Ibid.*

### 2. The Sale and Merger Agreement

Under the Agreement and Plan of Merger, Wynnchurch paid $87 million for JAC on December 20, 2010. In the agreement, JAC represented that (1) its financial statements were prepared in accordance with Generally Accepted Accounting Practices (GAAP); (2) the books and records of the company were "accurate and complete"; and (3) the company had no "liabilities" except those included on the balance sheet, incurred in the normal course of business since the balance sheet was prepared, or disclosed in Schedule 2.7(c) of the agreement. JAC further represented that in the year leading up to the closing, it had conducted its business in the usual course, consistent with its past practices, and there had been no "material adverse change" in its financial condition.

The agreement contained a merger clause, which stated that it embodied the entire agreement between the parties and that no party had relied on any prior "agreements, negotiations and understandings." Compl., Ex. A, Merger Agreement at 59–60, § 8.7. However, the agreement expressly stated that "claims based upon the breach of a representation or warranty which was made fraudulently or was intentionally or willfully breached, shall survive the Closing indefinitely." Compl., Ex. A, Merger Agreement at 44, § 7.1. The agreement further stated that the "Major Stockholders" disclosed in Schedule I agreed to indemnify JAC against any claims "arising out of . . . or caused by the inaccuracy of any representation or the breach of any warranty of the Company." Compl., Ex. A, Merger Agreement at 44, § 7.2. The agreement limited the liability of the stockholders to $3 million, except for claims based upon "an intentional or fraudulent misrepresentation." Compl., Ex. A, Merger Agreement at 48, § 7.6(d).

The agreement contained a choice of law clause stating that it would be "governed" and "construed" according to the laws of the State of Delaware.

The agreement was signed by Coleman on behalf of JAC. Coleman also signed the agreement on behalf of Atrium and the Coleman Trust "[a]s to Sections 1.6, 4.8, 6.4(c), 7.3 and 7.7 only."

### 3. The Conspiracy

Wynnchurch alleges that Cheney, Coleman, and Fowler, as principals of Annex, which was at the time Atrium's manager and thus held the controlling interest in JAC, carried out a wide ranging scheme between July 2010 and December 2010 to represent falsely the financial condition of JAC and thereby induce Wynnchurch to overpay by more than $50 million. Coleman, Cheney, and Fowler allegedly enlisted the cooperation of Morrey and Smoke; and Morrey, Smoke, and Cheney brought in "Agagonkin to prepare financial models for JAC's sale, and Agafonkin was recruited into the scheme as well." Compl. ¶¶ 26–27.

According to Wynnchurch, Annex's ownership and control of JAC gave it the

authority it needed to direct and control the disclosure of information to Wynnchurch throughout the due diligence process, and Annex's principals made use of that control to their benefit.

> For example, Coleman appointed himself chairman of JAC's Board of Directors and signed a management agreement with JAC giving him the means to control the company, which he then assigned to Annex. Fowler was similarly appointed as a Director of JAC. And Cheney arranged for JAC to hire him as a "consultant," whereby JAC's profits were used to compensate him for providing management services. Annex also installed Morrey as JAC's CEO and Smoke as its CFO, to act as Annex's agents to artificially enhance JAC's appearance of profitability by any and all means.

Compl. ¶ 20.

Smoke, as JAC's CFO, and in cooperation with the other defendants, allegedly carried out key aspects of the plan that involved concealing or misrepresenting items in the company's books.

> Smoke, at the instruction of and with the knowledge of the other Conspirators, instructed employees at JAC in an August 27, 2010 e-mail message to "manufacture" earnings when he saw that JAC's actual performance was coming in far lower than the Conspirators needed to get their desired price for JAC. By "manufacture," Smoke meant that he wanted—pursuant to the Conspirators' plan—JAC's employees to manipulate the company's financials to mask and conceal JAC's true financial condition. Smoke, under the direction of and with the knowledge of the other Conspirators, also directed JAC employees to ignore negative financial information

and withhold it from JAC's financial statements.

Compl. ¶ 35.

Agafonkin, as a consultant and employee to JAC, was charged with creating a false budget that diverged in material respects from the actual "internal" budget that Wynnchurch never saw before the closing. The internal budget was never furnished to the buyers, despite their request for all versions of internal budgets.

> Instead, [the defendants] provided a separate budget prepared by Agafonkin under the close direction and control of Cheney and the other Conspirators. Agafonkin's budget was, in short, a fake; it ignored operational expenses and costs to create more favorable numbers, and it only tracked the real budget when doing so would show gains to JAC's earnings.... Nevertheless, throughout due diligence, including on or about November 4, 2010, in a file uploaded to the electronic "dataroom" of documents used for due diligence, the Conspirators provided Agafonkin's phony budget to the Buyers in response to the Buyers' requests for JAC's internal budgets, fraudulently representing Agafonkin's as the one and only budget JAC maintained.

Compl. ¶ 29. The plaintiffs allege that this fake budget incorporated a number of significant adjustments, detailed below, which Wynnchurch alleges painted a far rosier picture of JAC's financial health than was revealed by their investigation of its actual condition and records after the closing. As a part of this plan, in order to buy more time to "adjust" the budget, Smoke and Agafonkin delayed the release of JAC's October 2010 financials from the buyers: "Smoke instructed Agafonkin on October 6, 2010 to delay financial reporting and conceal negative developments that would impact financial statements to further the

plan to fraudulently manipulate JAC's results." Compl. ¶ 37.

### a. November 2010 European Financials

In one of the central charges of the complaint, the plaintiffs allege that Cheney instructed Agafonkin to withhold the November 2010 European financial statements from Wynnchurch until after the closing, to prevent the plaintiffs from learning of a precipitous decline in JAC's condition that had come about in the months leading up to the closing. According to the complaint, Cheney, Morrey, Smoke, and Agafonkin all represented to Wynnchurch that the October 2010 financials—which themselves allegedly contained substantial lies and omissions—were the latest available data on the financial health of the company and were "accurate and complete" and "in full compliance with GAAP" as of closing. Compl. ¶ 38. Wynnchurch asserts that the concealment of the November 2010 financials was a key omission that was both fraudulent and violated the express warranties in the agreement, because they would have revealed significant undisclosed liabilities and material adverse changes in the company's financial position. According to the complaint, Morrey's and Smoke's withholding of the November 2010 financials was expressly authorized by Coleman, Fowler, and Cheney, acting under their authority as Annex principals. Morrey also cooperated in the scheme, by ordering European executives to provide the financial statements only to Smoke. Compl. ¶¶ 41–45.

### b. Intercompany Account Balance

Smoke and Agafonkin omitted a substantial "intercompany account balance" between the American and European subsidiaries, with the result that the two parts of the company together appeared to state higher earnings than had actually accrued. Cheney and Morrey allegedly authorized and directed this concealment. Compl. ¶ 64. This change had the effect of hiding more than $1 million in intercompany "chargebacks," which caused JAC's earnings to appear that much higher. Compl. ¶¶ 59–67.

Smoke suggested that the Conspirators record the remaining intercompany out-of-balance as part of the December 2010 financial statements that the Buyers would not see until after closing. In Smoke's own words, the Conspirators could "just let it ride until [then] and see if the auditors catch it." The other Conspirators knowingly agreed with this plan.

Compl. ¶ 68.

### c. European Chargebacks

Smoke presented JAC's financial results to the Buyers with an accumulated balance of $560,000 in certain rework expenses from July through November 2010 improperly reflected as "chargebacks" to the European subsidiary, despite the fact that the subsidiary had rejected those chargebacks, and the subsidiary's CEO had "told Smoke that the fact that Europe would not pay needed to be disclosed to the Buyers." Compl. ¶¶ 74–79.

### d. Renegotiated Terms of KIA Agreement

Morrey instructed Smoke and other employees at JAC to renegotiate a long term contract with KIA and change the terms so that KIA would make a one-time payment to JAC to cover anticipated tooling changes that would be needed to produce new part designs, in exchange for JAC's agreement to forego future piece-price increases that were intended to cover tooling costs under the agreement. JAC recorded the one-time payment as income, but did not record any liabilities for future tooling expenses that the payment was meant to cover or reimbursements owed to KIA under the new deal. Compl. ¶¶ 84–87. The new arrangement was not disclosed to the

buyers. Compl. ¶ 86. "Morrey and Smoke reported the KIA situation to Coleman, Fowler, and Cheney and manipulated the accounting of the deal at their instruction." Compl. ¶ 87.

### e. Inventory Shortages

The plaintiffs allege that to conceal a $2.7 million inventory shortfall at JAC's Saline, Michigan plant, "Morrey and Smoke, with the knowledge and consent of the other Conspirators, decided to cancel standard inventory counts at JAC in order to conceal the inventory issues and corresponding overstated earnings." Compl. ¶¶ 92–95. "On August 5, 2010, Cheney e-mailed Smoke and asked him for an update on how much JAC's inventory was 'inflated.'" Compl. ¶ 94.

> Smoke, with the full knowledge and support of Fowler and Cheney, also sent the Buyers—prior to closing—a spreadsheet that listed inventory values that had been slightly but insignificantly changed from values previously provided to the Buyers, further indicating that the Conspirators had recorded the physical counts from over the weekend and updated the financials accordingly. This was false.

Compl. ¶ 98–99.

Smoke improperly excluded "large components of inventory, including . . . all service parts and work in process from the calculation of JAC's 'Excess and Obsolete' inventory reserves." Compl. ¶ 104. "Smoke . . . improperly [excluded these] inventory categories from the calculations of JAC's Excess and Obsolete inventory reserves throughout the Buyers' due diligence in 2010." Compl. ¶ 105.

> On December 18, 2010, Smoke expressly directed a lower-level employee via an e-mail message not to give the Buyers or their due-diligence consultants the obsolete inventory listing for JAC's Franklin[, Georgia] facility until after closing. . . . JAC's financial situation [thus]

was overstated by approximately $2,155,000 at closing. Of that amount, $867,000 related to the period from January 2010 through the closing, which caused earnings for 2010 to be overstated by a corresponding amount and falsely inflated the apparent value of JAC.

Compl. ¶ 106.

### f. Chrysler Giveback

The plaintiffs also allege that Smoke and Morrey—under the instruction of Coleman, Fowler, and Cheney—falsely represented that hundreds of thousands of dollars in freight charges were "in dispute" between JAC and its customer, Chrysler. The complaint charges that they knew that JAC already had agreed to refund those charges, but they did not record a liability in the company's books for the refund owed. "As a result of resolving [one of the] dispute[s], JAC received $127,000 less than it had booked as accounts receivable." And "[t]he company already had agreed to both the giveback and the freight adjustment, which should have resulted in a hit to earnings of at least $400,000." Compl. ¶¶ 115–18.

### g. Condition of the W164 Tool

Smoke and Morrey, with the knowledge of Coleman, Fowler, and Cheney, concealed from the buyers severe problems with the "W164 Tool" on JAC's "Hydroform Press." According to Wynnchurch, JAC already had agreed to do significant rework for one customer that was caused by the problems with this tool. "The issue involving the tool was so severe that JAC and the customer involved negotiated a price adjustment over the issue . . . Morrey sought authorization from Annex, Coleman, Fowler, and Cheney regarding the decision to conceal the equipment's status." Compl. ¶ 123. Wynnchurch alleges that the undisclosed defects and re-

work needed forced it to "post an accrual of $5,376,818 on the December 31, 2010 balance sheet to account for the losses associated with the program related to the tool in question." Compl. ¶ 126.

### h. "Stretched" European Payables

According to the plaintiffs, Cheney and Smoke, under the authority of Annex, Coleman, and Fowler, came up with a plan to realized certain payables of the German subsidiary ahead of the time they would normally be accrued, in order to inflate JAC's current earnings. They also executed " 'a plan' that included 'stretching payables,' which would inflate cash flow." "Pursuant to the Conspirators' scheme, they instructed employees in Germany to delay 3.3 million of payments to vendors and suppliers, well in excess of the standard payment windows." That "significantly inflated the cash position and the true debt position on the balance sheet for JAC's German operations, which made JAC's German operations look financially healthier than they were." Compl. ¶¶ 130–31.

### i. Mazda Tooling Costs

The complaint alleges with little elaboration that JAC submitted a bid on the "J35C" project for its customer Mazda, but "the Conspirators" did not disclose to Wynnchurch the costs of the tooling needed for the project, even though those costs were known at the time of the closing. The defendants allegedly knew and did not disclose that "JAC would incur a loss of between $264,000 and $504,000 to cover tooling costs associated with the project when JAC was awarded the contract." Compl. ¶ 135.

### j. Customer Warranty Reserve

The complaint alleges that "the Conspirators" concealed a compromise of $150,000 in warranty claims with a customer, without recording a liability for the amount that JAC had agreed to pay to settle the claims. "The decision to mischaracterize the warranty charge and misrepresent its nature was made jointly by the members of the conspiracy to further their scheme, including Annex, Coleman, Fowler, Cheney, Morrey, and Smoke." Compl. ¶ 139.

### k. Group Medical Reserve

"Smoke and Morrey intentionally refused to account for" a reserve liability for the cost of group medical insurance in the amount of $252,000 "on the instructions of Annex, Coleman, Fowler, and Cheney." Compl. ¶ 142.

### l. Condition of the Saline Press

"Smoke and Morrey intentionally concealed" the severely defective status of a 3,000 pound press machine at JAC's Saline, Michigan facility "on the instructions of Annex, Coleman, Fowler, and Cheney." Compl. ¶ 146.

### m. Assembly Work Relocation

Smoke and Morrey allegedly relocated certain assembly operations without the approval of a key customer, in violation of the customer agreement, thus incurring significant costs to rectify the breach with the customer "with the knowledge of and at the instructions of Annex, Coleman, Fowler, and Cheney." Compl. ¶ 152.

### n. Michigan Sales Tax Audit

"Smoke and Morrey intentionally concealed the settlement" of a state sales tax audit resulting in a $180,000 tax debt owed to the State of Michigan "on the instructions of Annex, Coleman, Fowler, and Cheney." Compl. ¶ 157.

### C. Procedural History

The plaintiffs filed their complaint on December 12, 2012. The complaint includes thirty-one counts, based on (1) the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., and 17 C.F.R. § 240.10b–5 (counts I and II); (2) the Delaware Securities Act, Del.Code Ann. Tit. 6, § 73–101 et seq. (counts III and IV); (3) the Michigan

Uniform Securities Act of 2002, Mich. Comp. Laws § 451.2101 *et seq.* (counts V and VI); (4) fraudulent inducement (count VII); (5) fraudulent misrepresentation (count VIII); (6) silent fraud (count XI); (7) conspiracy and concert of action as to the fraud and silent fraud counts (counts IX, X, XII, and XIII); (8) negligent misrepresentation (count XIV); (9) innocent misrepresentation (count XV); and (10) breach of the purchase agreement based on the same misrepresentations that support the counts for fraud and securities violations (counts XVI–XXXI). On February 5, 2013, the Court entered a stipulated order dismissing all claims against defendant Amant Dewan. Thereafter, three groups of defendants filed their several motions to dismiss. The first group is Atrium, Annex, Coleman (as trustee), and Cheney. The second group consists of Coleman (individually), Fowler, Morrey, and Agafonkin. The third group consists of defendant Smoke alone, who simply adopts the arguments of the second group of defendants.

## II.

The defendants' motions to dismiss are brought under the authority of Federal Rule of Civil Procedure 12(b)(6). "The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief if all the facts and allegations in the complaint are taken as true." *Rippy ex rel. Rippy v. Hattaway,* 270 F.3d 416, 419 (6th Cir.2001) (citing *Mayer v. Mylod,* 988 F.2d 635, 638 (6th Cir.1993)). Under Rule 12(b)(6), the complaint is viewed in the light most favorable to plaintiffs, the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of plaintiffs. *Bassett v. Nat'l Collegiate Athletic Ass'n,* 528 F.3d 426, 430 (6th Cir.2008). As the Sixth Circuit explained,

[t]o survive a motion to dismiss, [a plaintiff] must plead "enough factual matter" that, when taken as true, "state[s] a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Plausibility requires showing more than the "sheer possibility" of relief but less than a "probab[le]" entitlement to relief. *Ashcroft v. Iqbal,* [556 U.S. 662, 678], 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

*Fabian v. Fulmer Helmets, Inc.,* 628 F.3d 278, 280 (6th Cir.2010). Stated differently, under the new regime ushered in by *Twombly* and *Iqbal,* pleaded facts must be accepted by the reviewing court, but conclusions ought not be accepted unless they are plausibly supported by the pleaded facts. "[B]are assertions," such as those that "amount to nothing more than a 'formulaic recitation of the elements'" of a claim, can provide context to the factual allegations, but are insufficient to state a claim for relief and must be disregarded. *Iqbal,* 556 U.S. at 681, 129 S.Ct. 1937 (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955). However, as long as a court can "'draw the reasonable inference that the defendant is liable for the misconduct alleged,' a plaintiff's claims must survive a motion to dismiss." *Fabian,* 628 F.3d at 281 (quoting *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937).

The arguments in the three motions to dismiss overlap. The defendants take aim at the fraud counts, contending that the complaint is not specific enough to satisfy the enhanced pleading requirements for allegations of fraud prescribed by Federal Rule of Civil Procedure 9(b). The defects, say the defendants, include the failure of the complaint to specify which defendants made which statements, the lack of attribution to specific defendants, the failure to allege a duty of disclosure, no allegations that satisfy the *scienter* requirement, and

the presence of language in the documents (including the merger clause) that precludes reasonable reliance on the pre-closing statements. The defendants also argue that the complaint does not allege properly that any of the defendants "made" the fraudulent statements within the meaning of the federal securities fraud statutes and regulations, which also dooms the Michigan statutory claim, and that the Delaware claim must fail because there is no nexus with that state sufficient to invoke the protection of its laws. And the defendants insist that since none of them were signing parties to the sale and merger agreement, they cannot be held accountable for the breaches of warranties alleged. The defendants also contend that the complaint does not include allegations that could render any of them liable as controlling persons. Finally, the defendants argue that under the agreement the plaintiffs are limited to recovering from the escrow fund set aside to cover misrepresentations and the proceeds of the errors and omissions insurance provided for and obtained under the agreement.

### A. Sufficiency of fraud allegations

██ When alleging fraud in a federal complaint, a party must state "with particularity" the circumstances constituting the fraud. Fed.R.Civ.P. 9(b); *see also Bennett v. MIS Corp.*, 607 F.3d 1076, 1100 (6th Cir.2010). That means that the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Indiana State Dist. Council of Laborers and Hod Carriers Pension and Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 942–43 (6th Cir.2009) (quotation marks and citation omitted). In addition, a party must identify the "alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of [the other party]; and the injury result-

ing from the fraud." *Coffey v. Foamex L.P.*, 2 F.3d 157, 161–62 (6th Cir.1993) (quotation marks and citations omitted). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b).

██ Nonetheless, "[w]hen faced with a motion to dismiss for failure to plead fraud 'with particularity' as required by Rule 9(b) ..., 'a court must factor in the policy of simplicity in pleading which the drafters of the Federal Rules codified in Rule 8.'" *Whalen v. Stryker, Corp.*, 783 F.Supp.2d 977, 982 (E.D.Ky.2011) (quoting *Michaels Building Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir.1988)). "Rule 9(b) is not to be read in isolation, but is to be interpreted in conjunction with Federal Rule of Civil Procedure 8." *United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 501 F.3d 493, 503 (6th Cir.2007) (quoting *Michaels*, 848 F.2d at 679). "When read against the backdrop of Rule 8, it is clear that the purpose of Rule 9 is not to reintroduce formalities to pleading, but is instead to provide defendants with a more specific form of notice as to the particulars of their alleged misconduct." *Ibid.* "The threshold test is whether the complaint places the defendant on sufficient notice of the misrepresentation allowing the defendants to answer, addressing in an informed way plaintiff[']s claim of fraud." *Coffey v. Foamex L.P.*, 2 F.3d 157, 162 (6th Cir.1993) (quotation marks omitted). "So long as [the plaintiff] pleads sufficient detail—in terms of time, place and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir.2008).

Where "there has been no discovery in [the] action, and the alleged fraud occurred over an extended period of time, is within the knowledge and control of [the defendants], and consisted of numerous acts[,] the specificity requirements of Rule 9(b) [should] be applied less stringently." *Whalen,* 783 F.Supp.2d at 982 (citing *Bledsoe,* 501 F.3d at 509–10). "It is a principle of basic fairness that a plaintiff should have an opportunity to flesh out her claim through evidence unturned in discovery. Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim." *Williams v. Duke Energy Int'l, Inc.,* 681 F.3d 788, 803 (6th Cir.2012).

### 1. Requisite detail

The plaintiffs have adequately stated claims for fraud in their complaint. First, they allege specific, affirmative misrepresentations made in (1) the fake budget provided to the plaintiffs on November 4, 2010; and (2) in the warranties and representations of the purchase agreement stating that JAC's books as presented were accurate and complete, that the company had no undisclosed liabilities, that its business had been carried out in the usual course, and that there had been no adverse material changes in its financial condition. Wynnchurch alleges that as a consequence of these false statements, it was induced to pay $50 million more for JAC than the company was actually worth. The complaint alleges thirteen specific instances where material negative financial information involving millions of dollars in fake earnings, hidden expenses, and unseen liabilities was withheld from the buyers despite their repeated requests for complete and accurate records of JAC's financial condition. Indeed, set against the sparing allegations of context and identity that this Court found sufficient in *Tramontana v.*

*May,* No. 02–10012, 2004 WL 539065 (E.D.Mich. Mar. 16, 2004), the charges of fraud in the complaint here are decadent in their extent and detail.

Moreover, the matter has just commenced, no discovery has occurred, and none of the defendants have answered the complaint. The complaint also alleges that one of the defendants actively tried to destroy records of thousands of email messages between the individual defendants that would reveal their specific plans and responsibilities in carrying out the scheme:

> Smoke was released from JAC almost immediately after closing. The Buyers discovered that before leaving, Smoke attempted to permanently delete incriminating email messages—including thousands of e-mails with co-Conspirators Coleman, Fowler, Cheney, Morrey, and Agafonkin—from his work computer and JAC's email server. There is no doubt Smoke deleted these emails in a knowing and intentional effort to prevent the Buyers from seeing his communications with the other Conspirators. Indeed, Smoke did not merely move the e-mails to his "Trash" or "Deleted Items" folder; instead, he double-deleted the files so they could not be easily restored.

Compl. ¶ 53. At this stage of the case, where a major part of the surviving evidence that would affirm or negate the individual culpability of each defendant is in the hands of those defendants themselves, it is appropriate to allow the plaintiffs claims to proceed. The complaint provides ample notice to the defendants which specific acts of fraud they allegedly participated in. With one exception, it names the individual defendants involved in making each of the fraudulent statements or deliberately withholding each of the material financial details described. If the defendants have reason to dispute their individual culpability in the specific

acts alleged, then discovery will provide them the opportunity to develop the record that they need to do so.

### 2. Identification of defendants

The defendants argue that because of the many references in the complaint to "the Conspirators," the plaintiffs have violated the rule that forbids "group pleading" averments of fraud. They argue that under *Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 745 (6th Cir.1992), a plaintiff must specify which of the defendants made each fraudulent statement and may not bring claims of fraud against "the defendants" generally. The plaintiffs argue that they are not "group pleading," because they use the general term "the Conspirators" to mean "each and every one" of the defendants. According to the plaintiffs, every occurrence of "the Conspirators" therefore effectively names each of the specific defendants.

■ It is plain that collective references to "the defendants" or other such categories by themselves fail the specificity test of Rule 9(b). *See D.E. & J Ltd. Partnership v. Conaway*, 284 F.Supp.2d 719, 730 (E.D.Mich.2003) (observing that "[n]ot only does such 'group pleading' run afoul of *Central Bank* [*v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994)], but also it fails to meet not only Fed.R.Civ.P. 9(b)'s specificity requirements but also the heightened standards for pleading a Section 10(b) violation after passage of the PSLRA" (citing cases)). The *Hoover* court did not discuss the allegations in the complaint in any detail, but only noted the collective reference in passing as an alternative ground for dismissal, besides the fact that the claims were all time barred. The defendants here point out numerous instances in which the complaint uses the phrase "the Conspirators," but they also disregard the extensive specific allegations of the complaint where, unlike in *Hoover*,

the plaintiffs named individual defendants associated with all but one of the fourteen acts of misrepresentation and concealment that they describe. Even with the collective references in the complaint, the pleading attributes specific false statements to identified individual defendants, and therefore the allegations satisfy Rule 9(b)'s specificity requirements.

#### a. Atrium, Annex, Coleman (as trustee), and Cheney

■ The defendants argue that the only party to the agreement was JAC, and that therefore it was JAC, not these defendants, that made the affirmative representations and warranties in the purchase agreement. However, as "Major Stockholders" Atrium and the Coleman Trust expressly agreed to indemnify JAC, which was a party to the entire agreement, for all claims relating to intentional fraud, misrepresentation, and breach of warranties made under the agreement. Compl., Ex. A, Merger Agreement at 44, § 7.2, 48, § 7.6(d). Because Atrium was "wholly controlled" by Annex at the time, Wynnchurch alleges that Atrium's acts were in fact Annex's acts, and that Annex is liable for those misrepresentations that Atrium undertook to indemnify JAC for.

The complaint specifically alleges that Cheney (1) came up with the plan to "stretch" the European payables; (2) instructed Agafonkin to withhold the October 2010 financials from the buyers so that "adjustments" could be made to Agafonkin's budget to make JAC's finance look better than the actual financials showed them to be; and (3) personally lied to the buyers in a December 16, 2010 email, telling them that the European November 2010 financials were not available. Cheney also instructed Agafonkin to make changes to the models used in his fake budget "to show better cash flow."

### b. Coleman, Fowler, Morrey, and Agafonkin

The complaint alleges that Coleman, along with Fowler and Cheney, instructed Smoke to withhold the November 2010 financials from the buyers in order to conceal JAC's financial decline. This is at a minimum an instruction for Smoke to commit silent fraud by suppressing the material fact of JAC's financial decline, under a duty to disclose that Coleman incurred as a result of Wynnchurch's specific requests for complete and accurate financial data. The complaint further alleges that Coleman (1) instructed Morrey, Smoke, and Agafonkin to come up with a plan to inflate JAC's earnings; (2) instructed Morrey and Smoke to withhold the November 2010 European financials; (3) instructed Morrey and Smoke to conceal the renegotiation of the KIA deal; (4) instructed Smoke and Morrey to conceal the Chrysler giveback; (5) instructed Morrey to conceal the condition of the "W164 Tool"; (5) authorized Cheney and Smoke to "stretch" the European subsidiary's payables to inflate earnings; (6) authorized the concealment of the customer warranty reserve; (7) instructed Smoke and Morrey to conceal the group medical reserve; (8) instructed Smoke and Morrey to conceal the condition of the Saline press; (9) instructed Smoke and Morrey to conceal the assembly work relocation; and (10) instructed Smoke and Morrey to conceal the settlement of the Michigan sales tax audit. According to the complaint, Coleman knew that each one of these specific misrepresentations was reflected in the fake budget and in the false representations and warranties presented in the purchase agreement, which he signed in his capacity as an officer of JAC and as the trustee of the Coleman Trust, which was a major shareholder in JAC.

Fowler approved in writing the plan to withhold all of the November 2010 European financials, because releasing any part of them might lead the buyers to question why the "full package" was not available. Fowler also expressly approved the concealment of (1) the KIA renegotiation; (2) the inventory shortages in the Saline and Franklin plants; (3) the Chrysler giveback; (4) the condition of the "W164 Tool"; (5) the "stretching" of European payables; (6) the customer warranty reserve; (7) the group medical reserve; (8) the assembly work relocation; and (9) the settlement of the Michigan sales tax audit.

Morrey specifically authorized Smoke to conceal or misstate (1) the intercompany account balance; (2) the renegotiated terms of the KIA agreement; (3) the inventory shortages at the Saline and Franklin plants; (4) the Chrysler giveback; (5) the condition of the "W164 Tool"; (6) the customer warranty reserve; (7) the group medical reserve; (8) the condition of the Saline press; (9) the unauthorized relocation of assembly work; and (10) the settlement of the Michigan sales tax audit. Morrey also ordered a European executive to provide the European November 2010 financials to nobody other than Smoke, in order to ensure that the buyers did not gain access to them.

Agafonkin prepared the fake budget that incorporated at least fourteen specific misstatements, concealments, omissions, and violations of GAAP described in the complaint. Agafonkin specifically discussed with other members of the conspiracy that he was preparing a budget that did not reflect JAC's true financial state, and it is fair to infer that he knew this budget would be presented to the buyers as accurate and complete, when on November 4, 2010, it was uploaded to the due diligence "electronic dataroom."

### c. Smoke

In addition to his part in the fraudulent scheme itself, the complaint specifically al-

leges that when he was dismissed, Smoke deleted thousands of e-email messages between himself and other defendants, in order to conceal their communications relating to the scheme. Smoke instructed JAC employees to "manufacture earnings" by using the laundry list of sketchy accounting techniques detailed in the complaint and by omitting a host of negative elements from the financial records provided to the buyers. Wynnchurch charges that Smoke was involved in and personally carried out every one of the specific incidents of concealment and misrepresentation detailed in the complaint, except for the issue of the Mazda tooling costs.

### 3. Reliance

The defendants argue that in the merger clause of the agreement, the plaintiffs disclaimed reliance on any prior "understandings" between the parties, which the defendants apparently read as a disclaimer of reliance on anything that the plaintiffs claimed they "understood" the defendants to have said about JAC's financial condition. The defendants argue that this clause expressly disclaimed reliance on any "statements" and "representations," but they do not point to any language in the merger clause that actually refers to "statements" or "representations." For the same reason, the defendants argue that the plaintiffs cannot show that any alleged reliance was "reasonable," where they disclaimed all reliance under the merger clause.

The plaintiffs argue that the "merger clause" of the agreement, by its language, extinguishes only prior contractual "understandings," not "understandings" the plaintiffs had about JAC's financial condition. The plaintiffs also point to §§ 7.1 and 7.6 of the agreement, which expressly preserve and exempt claims for willful fraud and misrepresentations. Moreover, the plaintiffs argue that since all of the defendants contend they were not parties

to the agreement, none of them may invoke the protections of the merger clause. The plaintiffs argue further that because the alleged fraud renders the entire agreement voidable, their claims are not extinguished by a merger clause in an agreement rendered invalid by the fraud alleged.

■■■■ To establish a claim for fraudulent inducement under Michigan law, the plaintiff must plausibly allege that

(1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth and as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage.

*Custom Data Solutions, Inc. v. Preferred Capital, Inc.*, 274 Mich.App. 239, 243, 733 N.W.2d 102, 105 (2006) (quotation marks and citations omitted). The presence of a merger clause in a written contract will not preclude a claim for fraud in the inducement where the plaintiff can show that it would have avoided the agreement entirely under the terms ostensibly agreed to, in the absence of the defendant's fraudulent representations. *Id.* at 244–45, 733 N.W.2d at 105–06.

Written contracts frequently contain merger clauses stating that the writing contains the entire contract and that no representations other than those contained in the writing have been made. Despite the existence of a merger clause, parol evidence is admissible for purposes of demonstrating that the agreement is void or voidable or for proving an action for deceit. *Fraus omnia corrumpit:* fraud vitiates everything it touches.

*Id.* at 243, 733 N.W.2d at 105 (quoting Calamari & Perillo, The Law of Contracts § 9.21, at 340–41 (4th ed.)). As the Sixth Circuit has explained:

> There is an important distinction between (a) representations of fact made by one party to another to induce that party to enter into a contract, and (b) collateral agreements or understandings between two parties that are not expressed in a written contract. It is only the latter that are eviscerated by a merger clause, even if such were the product of misrepresentation. It stretches the [holding of *UAW–GM Human Resource Center v. KSL Recreation Corp.*, 228 Mich.App. 486, 579 N.W.2d 411 (1998),] too far to say that any pre-contractual factual misrepresentations made by a party to a contract are wiped away by simply including a merger clause in the final contract.

*LIAC, Inc. v. Founders Ins. Co.*, 222 Fed. Appx. 488, 493 (6th Cir.2007) (quotation marks omitted).

The claims of common law fraud and statutory securities fraud are not barred by the language of the merger clause in the merger agreement. If the plaintiff proves its allegations, then the agreement is voidable, and claims of intentional fraud "are [not] wiped away by simply including a merger clause in the final contract." *LIAC*, 222 Fed.Appx. at 493; *Custom Data Solutions*, 274 Mich.App. at 243, 733 N.W.2d at 105; *see also Samuel D. Begola Services, Inc. v. Wild Bros.*, 210 Mich.App. 636, 640, 534 N.W.2d 217, 219 (1995) (holding that "[f]raud in the inducement to enter a contract renders the contract voidable at the option of the defrauded party").

On the Friday before the hearing scheduled on the motions, counsel for Atrium, Annex, Coleman (as trustee), and Cheney filed a "memorandum" styled as a letter addressed to the Court, which included a copy of an apparent agreement entered into by the parties prior to the start of the due diligence process. The defendants argue that the disclaimer of reliance on any representations as to the "completeness or accuracy" of information that would be provided "eviscerates" the plaintiffs' fraud claims. However, as the defendants point out, the final purchase agreement contained a merger clause which purported to negate all prior arrangements between the parties. The nondisclosure agreement therefore cannot "eviscerate" claims based on the affirmative warranties and representations made in the final purchase agreement.

Moreover, the nondisclosure agreement itself does not describe the information it purported to disclaim. Most or all of the concealment and withholding of information in response to specific requests from the plaintiffs evidently occurred after the due diligence process began, and the defendants cannot avoid the positive duties of disclosure imposed on them during due diligence simply because of a purported disclaimer executed before those duties arose. It also remains to be seen what material the nondisclosure disclaimer applied to; if the parties understood it to apply only to some initial set of information provided contemporaneously with the agreement, then it is irrelevant to misrepresentations and nondisclosures that occurred later.

In all events, the merger clause does not render the plaintiffs' reliance on the defendants' statement of the financial condition of JAC unreasonable.

#### 4. *Duty*

The defendants also argue that all of the fraud claims are precluded by the rule of *Hart v. Ludwig*, 347 Mich. 559, 567, 79 N.W.2d 895 (1956), which according to the defendants held that a plaintiff may not prevail on any claim for tort liability where

the relationship of the parties is entirely governed by a contract between them. According to the defendants, under the "economic loss doctrine," the plaintiffs cannot demonstrate that the defendants owed them any duty not expressly embodied in the purchase agreement, and therefore all of the tort claims are precluded.

However, according to *Hart*, a claim for fraud is only prohibited if it arose solely from a duty imposed under the terms of the contract between the parties. *Id.* at 563, 79 N.W.2d at 897–98. A fraud action may proceed where that "tort action would lie without having recourse to the contract itself." *Id.* at 565, 79 N.W.2d at 898. A fraud-in-the-inducement claim falls into that category and is not barred by the rule in *Hart* or the economic loss doctrine.

The economic loss doctrine is a "judicially created doctrine" that prohibits a party to a contract from bringing tort claims that are factually indistinguishable from breach of contract claims. *Detroit Edison Co. v. NABCO, Inc.,* 35 F.3d 236, 240 (6th Cir.1994). However, Michigan courts have recognized an exception to the economic loss doctrine for the intentional tort of fraud in the inducement. "Fraud in the inducement . . . addresses a situation where· the claim is that one party was tricked into contracting. It is based on pre-contractual conduct which is, under the law, a recognized tort." *Huron Tool & Eng'g Co. v. Precision Consulting Services, Inc.,* 209 Mich.App. 365, 371, 532 N.W.2d 541, 544 (1995) (citing *Williams Electric Co. Inc. v. Honeywell, Inc.,* 772 F.Supp. 1225, 1237–1238 (N.D.Fla.1991)). "Fraud in the inducement presents a special situation where parties to a contract appear to negotiate freely—which normally would constitute grounds for invoking the economic loss doctrine—but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudu-

lent behavior." *Id.* at 372, 532 N.W.2d at 546. The essence of the claim here is that the pervasive effort to conceal JAC's true financial condition "interfered with the conventional market forces in a manner that is beyond the power of the law of contracts to protect." *Tramontana,* 2004 WL 539065, at *12. The economic loss doctrine does not bar that claim.

The motions to dismiss the fraud claims (including the claims of fraudulent inducement, fraudulent misrepresentation, silent fraud, negligent misrepresentation, and innocent misrepresentation) on the various grounds alleged by the defendants, therefore, will be denied.

### B. Federal securities violations

In addition to arguing that the averments of fraud are not sufficiently specific—a claim that is rejected here—the defendants contend that the plaintiffs may not proceed under section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) or 17 C.F.R. § 240.10b–5 (Rule 10b–5) because they did not allege that any of the defendants were the "maker" of the fraudulent statements, nor does the complaint contain allegations of *scienter.* The defendants also insist that the allegations of *scienter* do not satisfy the Private Securities Litigation Reform Act (PSLRA).

The Securities Exchange Act of 1934 and the regulations enacted pursuant to it make it illegal for any person,

directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any

act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. "The § 10(b) implied private right of action does not extend to aiders and abettors. The conduct of a secondary actor must satisfy each of the elements or preconditions for liability." *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta*, 552 U.S. 148, 158, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008).

The PSLRA requires additional and more "[e]xacting pleading requirements" for federal securities fraud statutory claims. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). A plaintiff must "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'" *Ibid.* (citing 15 U.S.C. § 78u–4(b)(1), (2)).

### 1. Rule 10b–5(b) "Maker" Liability

 "[I]norder to state a [false statement] claim under Section 10(b) of the Securities Exchange Act of 1934, or under SEC Rule 10b–5[(b)], a plaintiff must allege: (1) a misrepresentation or omission; (2) of a material fact that the defendant had a duty to disclose; (3) made with scienter; (4) justifiably relied on by plaintiffs; and (5) proximately causing them injury." *City of Monroe Employees Retirement System v. Bridgestone Corp.*, 399 F.3d 651, 668 (6th Cir.2005). "A statement is said to be 'actionable' when it satisfies the first two of these requirements, i.e., it is a misrepresentation or omission of a material fact that the defendant had a duty to disclose." *Ibid.* The Sixth Circuit has explained that a statement is "material" "where there is a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Zaluski v. United American Healthcare Corp.*, 527 F.3d 564, 571–72 (6th Cir.2008) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)).

 In addition, the plaintiff must show that the defendant "made" the fraudulent statement at issue. In *Janus Capital Group, Inc. v. First Derivative Traders*, ─── U.S. ───, 131 S.Ct. 2296, 180 L.Ed.2d 166 (2011), the Supreme Court explained in this fraud-on-the-market case that the "maker" of a statement is that person with ultimate authority over its publication. The term "maker" does not include every person who may have participated in the preparation and publication of the statement. Instead, "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 2302. The Court acknowledged that "attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed." *Ibid.* Therefore, for the purpose of Rule 10b–5(b), a person "make[s] any … statement" if authority and attribution are shown.

 In *Janus,* the Supreme Court held that an investment advisory corporation that was legally and financially independent of the investment fund to which it provided management and administrative services did not "make" allegedly fraudulent statements published in the fund's prospectus, because the fund bore the sole statutory obligation to file the prospectuses under federal law. Although the adviser may have "participated in" creating the filings, nothing in the record suggested that the investment adviser itself

assumed any role in or control over the filing of the documents. *Id.* at 2299–2300, 2304–05. Despite the constriction of "maker" liability after *Janus* to those with "ultimate authority" over a statement, that liability still may extend to corporate officers who sign a false statement under their responsibility and authority as agents of the corporation. *Louisiana Mun. Police Employees Retirement System v. KPMG, LLP,* No. 10–01461, 2012 WL 3903335, at *5–6 (N.D.Ohio Aug. 31, 2012).

### 2. Rule 10b–5(a) and (c) "Scheme" Liability

Rule 10b–5 also imposes liability for participating in a deceptive or fraudulent "scheme" or "course of business," in addition to simply "making" a false statement. 17 C.F.R. § 240.10b–5(a), (c). As the Supreme Court observed, scheme or practice liability is distinct from "maker" liability. "[T]he second subparagraph of [Rule 10b–5] specifies the making of an untrue statement of a material fact and the omission to state a material fact. The first and third subparagraphs are not so restricted." *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 152–53, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). "[A] defendant 'not liable under Rule 10b–5(b) for failure to disclose ... may still be held liable under Rule 10b–5(a) and 10b–5(c) as a participant in [an] allegedly fraudulent scheme.' A plain-language reading of the Rule supports this view." *Benzon v. Morgan Stanley Distributors, Inc.,* 420 F.3d 598, 610 (6th Cir.2005) (quoting *Scholnick v. Schecter,* 752 F.Supp. 1317, 1323 (E.D.Mich.1990)).

Although "an alleged misstatement or omission is not a required element for a successful 10b–5(a) or (c) claim, the other elements of a Rule 10b–5 claim must still be shown." *Clayton v. Heartland Resources, Inc.,* 754 F.Supp.2d 884, 895–96 (W.D.Ky.2010) (citing *In re Merrill Lynch Investment Mgmt. Funds Secs. Litig.,* 434

F.Supp.2d 233, 237 (S.D.N.Y.2006)). The holding of *Janus* that constrained "maker" liability under Rule 10b–5(b) did not alter the landscape for claims based on "deceptive conduct" or "scheme" allegations under Rule 10–b5(a) and (c). *Hawaii Ironworkers Annuity Trust Fund v. Cole,* No. 10–371, 2011 WL 3862206, at *5–7 (N.D.Ohio Sept. 1, 2011).

### 3. Scienter

"To state a securities fraud claim under [Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ], a plaintiff must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury." *Frank v. Dana Corp.,* 646 F.3d 954, 958 (6th Cir. 2011) (quoting *Frank v. Dana Corp.,* 547 F.3d 564, 569 (6th Cir.2008)) (quotation marks omitted in this and subsequent citations). "Regarding the scienter requirement, the Private Securities Litigation Reform Act requires that plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' " *Ibid.* (quoting *Konkol v. Diebold, Inc.,* 590 F.3d 390, 396 (6th Cir.2009)). "Scienter may take the form of knowing and deliberate intent to manipulate, deceive, or defraud, and recklessness." *Id.* at 959. "Recklessness is defined as 'highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it.' " *Ibid.* (quoting *PR Diamonds, Inc. v. Chandler,* 364 F.3d 671, 681 (6th Cir. 2004)). "Recklessness is not negligence, but more 'akin to conscious disregard.' " *Ibid.* (quoting *PR Diamonds,* 364 F.3d at 681).

When faced with a motion to dismiss a section 10(b) action, the Court must (1) accept the pleaded factual allegations as true; (2) consider the whole complaint and related documents together; and (3) account for "plausible opposing inferences." *Frank,* 646 F.3d at 959 (quoting *Tellabs, Inc.,* 551 U.S. at 322–24, 127 S.Ct. 2499). "The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Ibid.* However, the "complaint will survive only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Ibid.*

The Sixth Circuit's "non-exhaustive list of factors" that "are 'usually relevant' to its analysis," *Frank,* 646 F.3d at 959 n. 2, include allegations of "divergence between internal reports and external statements on the same subject"; "closeness in time of an allegedly fraudulent statement or omissions and the later disclosure of inconsistent information"; "disregard of the most current factual information before making statements"; "the personal interest of certain directors in not informing disinterested directors of an impending sale of stock"; and "the self-interested motivation of defendants in the form of saving their salaries or jobs." *Ibid.* (citing *Helwig v. Vencor, Inc.,* 251 F.3d 540, 552 (6th Cir.2001)).

### 4. *The plaintiffs' claims*

Although the complaint does not cite the subsections of 17 C.F.R. § 240.10b–5, it does allege (1) express false representations attributed to individual defendants with authority to make them concerning JAC's compliance with GAAP, conduct of business in the usual course, and absence of adverse material changes after Decem-

ber 2009; (2) express false misrepresentations and omissions in the substance of the fake budget disclosed to the buyers during due diligence in November 2010, which was presented as being current, accurate, complete, and as reflecting all material aspects of JAC's financial condition; and (3) participation in a fraudulent scheme or course of business, in the form of the fourteen specific concealments, misrepresentations, and deviations from GAAP described in the complaint. The conduct charged comprises not just specific false statements made in the purchase agreement warranties and the fake budget, but also the planning and carrying out of a comprehensive scheme, by specific steps, to mislead the buyers as to JAC's value, and willfully to withhold material information in response to the buyers' specific requests for JAC's financial data during due diligence. The complaint thus alleges both (1) false statements in violation of Rule 10b–5(b) and (2) deceptive "scheme" or "course of business" violations of 10b–5(a) and (c).

Viewing the complaint as a whole and accepting all of the facts alleged in the complaint as true, the pleadings support an inference of scienter that is at least as strong as any alternative inference. Here, the plaintiffs have alleged facts pertinent to at least four of the factors that the Sixth Circuit has enumerated as informing an inference of scienter: (1) divergence between internal reports and external statements on the same subject; (2) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (3) disregard of the most current factual information before making statements; and (4) the self-interested motivation of defendants in the form of saving their salaries or jobs. *Frank,* 646 F.3d at 959 n. 2. These facts amply support a "strong inference" of

scienter on the part of each of the defendants.

### a. Atrium, Annex, Coleman (as trustee), and Cheney

 In the case of the corporate defendants Atrium and Annex, the scienter of their principals Coleman, Fowler, and Cheney is imputed to them. *Elbit Sys., Ltd. v. Credit Suisse Grp.*, 917 F.Supp.2d 217, 229–30 (S.D.N.Y.2013).

Coleman was managing partner of Annex, trustee of the Coleman Trust, and Chairman of the Board of JAC. He also signed the merger agreement on behalf of JAC, Atrium, and the Trust. Coleman was paid a portion of JAC's earnings under his compensation agreement, and his trust was listed as one of JAC's major stockholders at the time of the closing. Coleman personally and his trust therefore stood to gain from inflating JAC's earnings and value. As the majority shareholder in JAC, Annex and its principals stood to profit from receiving the highest possible price from the buyers; the complaint also alleges that the stockholders in JAC were eager to close the transaction before the end of 2010 in order to avoid anticipated higher capital gains tax rates. The complaint plainly alleges that Coleman, along with Fowler and Cheney, instructed Smoke to withhold the November 2010 financials from the buyers in order to conceal JAC's financial decline. As discussed above, Coleman also authorized or commanded at least ten of the separate, specific concealments and misrepresentations alleged in the complaint.

Cheney is a principal and agent of Annex and received a transaction bonus of $1.45 million at closing. The complaint alleges that Cheney knew of and expressly instructed Smoke, Morrey, and Agafonkin to carry out every one of the specific misrepresentations detailed in the complaint, other than the concealment of the Mazda

tooling costs. Moreover, the complaint specifically alleges that Cheney (1) came up with the plan to "stretch" the European payables; (2) instructed Agafonkin to withhold the October 2010 financials from the buyers so that "adjustments" could be made to Agafonkin's budget to make JAC's finances look better than the actual financials showed them to be; and (3) personally lied to the buyers in a December 16, 2010 email, telling them that the European November 2010 financials were not available. Cheney also instructed Agafonkin to make changes to the models used in his fake budget "to show better cash flow."

### b. Coleman (individually), Fowler, Morrey, and Agafonkin

Fowler is a managing partner of Annex and a director of JAC. He was paid more than $729,000 for his stock options in JAC as a result of the sale. Fowler allegedly approved in writing the plan to withhold all of the November 2010 financials, because releasing any part of them might lead the buyers to question why the "full package" was not available. Fowler also expressly approved the concealment of (1) the KIA renegotiation; (2) the inventory shortages in the Saline and Franklin plants; (3) the Chrysler giveback; (4) the condition of the "W164 Tool"; (5) the "stretching" of European payables; (6) the customer warranty reserve; (7) the group medical reserve; (8) the assembly work relocation; and (9) the settlement of the Michigan sales tax audit.

Morrey is a current or former operating partner of Annex and CEO and was President of JAC until January 2011. According to the complaint, Morrey specifically authorized Smoke to conceal or misstate (1) the intercompany account balance; (2) the renegotiated terms of the KIA agreement; (3) the inventory shortages at the Saline and Franklin plants; (4) the Chrys-

ler giveback; (5) the condition of the "W 164 Tool"; (6) the customer warranty reserve; (7) the group medical reserve; (8) the condition of the Saline press; (9) the unauthorized relocation of assembly work; and (10) the settlement of the Michigan sales tax audit. Morrey also allegedly ordered a European executive to provide the European November 2010 financials to nobody other than Smoke, in order to ensure that the buyers did not gain access to them.

Agafonkin was an employee of JAC prior to the sale, and Annex granted him "thousands of stock options in JAC." Agafonkin was "recruited" by Coleman, Fowler, and Cheney, and he took on the task of preparing a fake budget that incorporated at least fourteen specific misstatements, concealments, omissions, and violations of GAAP described in the complaint. The complaint states that Agafonkin specifically discussed with other members of the conspiracy that he was preparing a budget that did not reflect JAC's true financial state. It is fair to infer that he knew this budget would be presented to the buyers as accurate and complete, when on November 4, 2010, it was uploaded to the due diligence "electronic dataroom."

### c. Smoke

Smoke was the CFO of JAC until he was fired on December 21, 2010. It is reasonable to infer that as an officer and employee of JAC, he stood to gain from the misrepresentations by preserving his own salary and position. The complaint also alleges that when he was dismissed, Smoke deleted thousands of email messages between himself and other defendants, in order to conceal their communications relating to the fraudulent scheme. Moreover, Smoke allegedly instructed JAC employees to "manufacture earnings" by using the laundry list of sketchy accounting techniques detailed in the complaint and by omitting a host of negative ele-

ments from the financial records provided to the buyers. Wynnchurch charges that Smoke was involved in and personally carried out every one of the specific incidents of concealment and misrepresentation detailed in the complaint, except for the issue of the Mazda tooling costs.

The Court finds that the complaint properly pleads claims under the federal securities statutes and rules.

### C. Control person liability

The defendants argue that the complaint fails to state valid "control person" violations because (1) the complaint does not establish any underlying primary violation against any defendant; (2) the complaint alleges only that certain defendants owned some stocks and options in JAC, and controlled its operations "by contract," but fails to allege specifically how these interests in JAC gave them "control" over its actions; (3) the complaint fails to allege how outside directors had any control in fact over Morrey, Smoke, and Agafonkin; and (4) vague allegations of visits to JAC's facilities and "constant communication" regarding "the scheme" do not suffice to establish actual control over any of the alleged primary violators.

The Securities Exchange Act imposes liability on a "controlling person" for frauds committed by a person controlled. Section 20(a) of the Act states that liability is "joint[ ] and several[ ]" and is imposed on "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder." 15 U.S.C. § 78t(a). "Section 20(a) claims are predicated upon at least one underlying violation committed by a controlled party." *Frank*, 646 F.3d at 962. "A director of a corporation is not automatically liable as a controlling person. There must be some showing of actual participation in the corporation's operation or some influence be-

fore the consequences of control may be imposed." *Herm v. Stafford*, 663 F.2d 669, 684 (6th Cir.1981). As one commentator has explained, the existence of control by one person over another is a factual question not amenable to bright line rules. Position as an officer or director, possession of a significant block of voting stock, and the direction of employees within the scope of their duties, although not dispositive of the question, is evidence that may establish the exercise of "control." Edward Brodsky and M. Patricia Adamski, Law of Corporate Officers and Directors: Rights, Duties and Liabilities § 16:3 (2012) (observing that majority shareholders, minority shareholders, supervisors exercising the authority of an employer, and corporate officers and directors all have been found to be controlling persons within the meaning of § 20. "A controlling person, thus, possesses the power to influence the operations and activities of the primary wrongdoer.").

As to defendants Annex, Coleman, Cheney, and Fowler, the complaint alleges facts sufficient to support plausible claims of secondary liability under federal law. As noted above, position as an officer or director, possession of a significant block of voting stock, and the direction of employees within the scope of their duties are all evidence that, though not dispositive of the question, may establish the exercise of "control."

■■■ The complaint alleges that Annex at the time of the sale was the manager of Atrium, which was the majority shareholder in JAC. Coleman individually was the chairman of JAC's board, was paid a percent of JAC's earnings, and was the trustee of the Coleman Trust. It fairly can be inferred from those allegations that he directed the voting rights of the Trust as a major shareholder in JAC consistently with his own self-interest as a managing partner of Annex in assuring the highest

possible price for JAC's purchase. Fowler is a principal of Annex and owned significant stock options in JAC, for which he received more than $729,000 as a result of the sale. Cheney is a principal of Annex and received a "bonus" of $1.45 million when the sale of JAC closed. As discussed above, Coleman, Fowler, and Cheney each instructed Morrey, Smoke, and Agafonkin in carrying out specific elements of the plan, and in several cases Cheney and Fowler came up with elements of the scheme themselves.

To the extent that the defendants may dispute which of them had "ultimate authority" for or most actively controlled the actions of JAC, Morrey, Smoke, and Agafonkin in implementing the plan, those questions may be illuminated by the parties during discovery.

### D. State securities law claims

The defendants argue that the Delaware Securities Act does not apply because there is no allegation in the complaint of any "sufficient nexus" between the transaction and Delaware. They also contend that the Michigan Uniform Securities Act claims must fail for the same reasons as the federal Rule 10b–5 claims, that is, insufficient allegations about who "made" the fraudulent statements, and unspecific averments of fraud.

#### 1. Delaware Securities Act

■■■ The Delaware courts have held that the Delaware Securities Act imposes liability only where the transaction in question bears a "sufficient nexus" to the State. *Vichi v. Koninklijke Philips Electronics N.V.*, 2009 WL 4345724, at *19 (Del.Ch. Dec. 1, 2009). In restricting the reach of its statutes, the Delaware Supreme Court relied on "a presumption that a law is not intended to apply outside the territorial jurisdiction of the State in which it is enacted." *Singer v. Magnavox Co.*, 380 A.2d 969, 981 (Del.1977). The only

connection to Delaware that emerges from the pleaded facts in this case is that JAC is chartered there. But the Delaware Supreme Court "do[es] not read the [Delaware Securities] Act as an attempt to introduce Delaware commercial law into the internal affairs of corporations merely because they are chartered here." *Ibid.* There are no allegations that any of the conduct took place in that state, that any of the alleged fraudulent communications were made or received there, or that the transaction was closed in or bore any other relationship at all to Delaware.

The Court will dismiss the claims under the Delaware Securities Act.

### 2. *Michigan Uniform Securities Act*

"Michigan comprehensively overhauled its Uniform Securities Act effective October 1, 2009." *Perfecting Church v. Royster, Carberry, Goldman & Associates, Inc.,* 2011 WL 4407439, at *2 n. 2 (E.D.Mich. Sept. 22, 2011). The Act now states that

It is unlawful for a person, in connection with the offer, sale, or purchase of a security, to directly or indirectly do any of the following:

(a) Employ a device, scheme, or artifice to defraud.

(b) Make an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

(c) Engage in an act, practice, or course of business that operates or would operate as a fraud or deceit on another person.

Mich. Comp. Laws § 451.2501.

The language of this statute tracks the federal securities laws and regulations. Our Court has held that "a securities claim under [the Michigan Uniform Security Act] is nearly identical to the corresponding federal securities fraud

claim," and thus "if Plaintiffs have adequately alleged (a) a claim under the Federal statutes, and (b) the applicability of the state statute to the parties, the state claims will survive [a] Motion to Dismiss." *The MJK Family LLC v. Corporate Eagle Management Services, Inc.,* No. 09–12613, 2009 WL 4506418, at *4 (E.D.Mich. Nov. 30, 2009) (evaluating claims brought under the repealed act). The same result obtains here.

### E. Conspiracy claims

The defendants argue that all of the conspiracy and concert of action claims fail because the plaintiffs do not successfully allege any underlying torts by the defendants. The Court disagrees.

Under Michigan law, a claim of civil conspiracy requires the plaintiff to show "a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n,* 257 Mich.App. 365, 384, 670 N.W.2d 569, 580 (2003) (quotation marks and citation omitted). To establish a concert of action claim, a plaintiff must prove "that all defendants acted tortiously pursuant to a common design" that caused harm to the plaintiff. *Abel v. Eli Lilly & Co.,* 418 Mich. 311, 338, 343 N.W.2d 164, 176 (1984). For both civil conspiracy and concert of action, the plaintiff must establish some underlying tortious conduct. *Holliday v. McKeiver,* 156 Mich.App. 214, 217–219, 401 N.W.2d 278, 279–80 (1986).

The plaintiffs have stated adequately their fraud claims, and they have alleged that specific defendants conspired together to advance their fraudulent objectives. The conspiracy claims are not subject to dismissal at this stage of the case.

### F. Breach of contract claims

Annex, Coleman (individually), Cheney, Fowler, Morrey, Agafonkin, and Smoke argue that the misrepresentation claims based on express warranties in the agreement and all of the breach claims fail because the moving defendants were not parties to the agreement, and therefore assumed no obligations under it.

■ To state a claim for breach of contract under Michigan law, a plaintiff first must establish the elements of a valid contract. *Pawlak v. Redox Corp.*, 182 Mich.App. 758, 765, 453 N.W.2d 304, 307 (1990). The elements of a valid contract in Michigan are 1) parties competent to contract, 2) a proper subject matter, 3) a legal consideration, 4) mutuality of agreement, and 5) mutuality of obligation. *Thomas v. Leja*, 187 Mich.App. 418, 468 N.W.2d 58, 60 (1991).

■ The parties do not dispute the existence of a contract to which defendants Atrium, the Coleman Trust, and the plaintiffs were parties. The complaint plausibly states claims for breach of the agreement against defendants Atrium and the Coleman Trust, because as "Major Stockholders" they expressly agreed to indemnify JAC, which was a party to the entire agreement, for all claims relating to intentional fraud, misrepresentation, and breach of warranties made under the agreement. Compl., Ex. A, Merger Agreement at 44, § 7.2, 48, § 7.6(d). As discussed above, there are ample allegations in the complaint to support a breach of the express warranties and representations made under the agreement as to JAC's financial condition. To the extent that the warranties and representations in the purchase agreement were made by JAC itself as party to the agreement, any liability for intentional fraud in those representations was expressly assumed by Atrium and the Coleman Trust, and intentional fraud is not subject to the $3,000,000 limit on liability stated in the agreement. Annex, Coleman (individually), Cheney, Fowler, Morrey, Agafonkin, and Smoke were not parties to the agreement and therefore they cannot be held liable on any claims for breach.

### III.

The complaint states viable claims of fraud under federal and Michigan securities statutes against all of the defendants. The same must be said for the controlling person and conspiracy claims. Because certain of the defendants were not parties to the agreement, no breach of contract or warranty claims can proceed against them. And because there is no nexus to the State of Delaware, the plaintiffs' Delaware state law claim must be dismissed.

Accordingly, it is **ORDERED** that the motions to dismiss by defendants Atrium, Annex, Coleman (as trustee), and Cheney [dkt. # 28], defendants Coleman (individually), Fowler, Morrey, and Agafonkin [dkt. # 29], and defendant Smoke [dkt. # 31] are **GRANT IN PART AND DENIED IN PART.**

It is further **ORDERED** that all claims for breach of contract or warranty are **DISMISSED** as to defendants Annex, Cheney, Coleman (individually), Fowler, Morrey, and Agafonkin.

It is further **ORDERED** that the claims under the Delaware Securities Act are **DISMISSED.**

It is further **ORDERED** that the motions to dismiss are **DENIED** in all other respects.

It is further **ORDERED** that the defendants must answer the complaint **on or before March 3, 2014.**

It is further **ORDERED** that the counsel for the parties must appear for a case

management and scheduling conference on **March 5, 2014 at 2:30 p.m.**